217 So.2d 803

**SAN ANN TOBACCO COMPANY, Inc., et al.**

v.

**Phillip HAMM, Commissioner of Revenue.**

3 Div. 265.

Supreme Court of Alabama.

Oct. 10, 1968.

Rehearing Denied Jan. 16, 1969.

398

MacDonald Gallion, Atty. Gen., Willard W. Livingston and Wm. H. Burton, Asst. Attys. Gen., and White E. Gibson, Jr., of Lange, Simpson, Robinson & Somerville, Birmingham, for appellee.

T. J. Carnes, Albertville, and Earl Gillian, Montgomery, for appellants.

MERRILL, Justice.

This case was originally assigned to another member of the court and was reassigned to the author of this opinion on July 29, 1968.

This appeal is from a decree holding the Alabama Unfair Cigarette Sales Act, as amended, constitutional and denying the relief sought by complainants and appellants, San Ann Tobacco Company, Inc., hereinafter called Tobacco Company, and San Ann Service, Inc., hereinafter called Service Company.

The bill, as amended, was a suit for declaratory judgment against the Commissioner of Revenue of the State of Alabama, alleging that a justiciable controversy existed between the parties over the price at which Tobacco Company could sell cigarettes; assailing the constitutionality of the Alabama Unfair Cigarette Sales Act, as amended, and relief from the enforcement of the Act.

After demurrer to the bill was overruled, appellant Tobacco Company sought relief pendente lite, and at a hearing the court found from the testimony that Tobacco Company was not complying with the Act in that it was selling cigarettes at retail in Jefferson County and in other counties in this state at prices below cost to it as a retailer with the obvious intent to injure its competitors and to destroy or substantially lessen competition as prohibited by the Act.

The bill was then amended to show a controversy over whether Tobacco Company was selling cigarettes below cost as defined in the Act, and alleging that they proposed to sell or offer for sale at their retail filling stations in Jefferson County a pack of cigarettes at a price of 1¢ below the cost of cigarettes to it and its cost of doing business in connection with the purchase of one gallon of gasoline at the gasoline stations where the cigarettes were sold, and by adding San Ann Service, Inc., as a party complaint. The respondent's answer was in effect a general denial and the general issue.

After a hearing, the trial court rendered a decree holding the Alabama Unfair Cigarette Sales Act valid and constitutional in all aspects challenged by the bill, holding that the two corporate complainants "are one," that complainants had failed to prove their cost of doing business, that complainants had sold cigarettes as a retailer at below cost as defined in the Alabama Unfair Cigarette Sales Act with the intent to injure competitors, destroy or substantially lessen competition, holding that the proposed sale of cigarettes in connection with the purchase of gasoline would be unlawful under the Act and that the Act so construed was valid, holding that complainants did not come into equity with

clean hands, denying all relief and dismissing the bill.

The Alabama Unfair Cigarette Sales Act is Act No. 805, Acts of Alabama 1951, and listed as Tit. 57, § 83(1) et seq., 1958 Recompilation. The Act was amended in 1965 by Act No. 78, Acts of Alabama 1965, p. 105, Second Special Session.

This court held the original Act to be constitutional on its face, Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So. 2d 252, and appellants do not attack that holding. But appellants do argue that one part of the 1965 amendment does render the Act unconstitutional on its face.

The pertinent part of § 3(a) (Tit. 57, § 83(3)) of the original Act provided:

"It shall be unlawful for any wholesaler or retailer, with intent to injure competitors, destroy or substantially lessen competition, to advertise, offer to sell, or sell at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer as the case may be."

This sentence was amended in 1965 and we emphasize the five additional words added which are pertinent to this decision:

"It shall be unlawful for any wholesaler or retailer with intent to injure competitors, destroy or substantially lessen competition, *or with the effect thereof*, to advertise, offer to sell or sell at wholesale or retail cigarettes at less than cost to such wholesaler or retailer as the case may be, * * *."

We quote excerpts from the decision in Simonetti, Inc. v. State ex rel. Gallion, supra:

" 'The present bill directly alleges a dual or cumulative specific intent to "injure competitors *and* destroy or substantially lessen competition" and that respondent's advertising, offers to sell, and sale of cigarettes at wholesale have been "at less than cost to said respondent." These are considered to be allegations of ultimate,

issuable facts, sufficient for the purpose of pleading, since the respondent's actual intent in fact, its costs, and its selling prices are presumably matters within its knowledge, and greater particularity would not seem to be required either to frame the issue or inform respondent of the charge against which it is required to defend. By these allegations, the State as complainant assumes a heavy burden of proof, since it must be proof of far more than mere intent of injury to competitors or "unfairness" of competition. It must also prove, under the construction placed upon the Act, a selling below cost with the specific intent of destroying or substantially lessening competition, since the Act, if valid at all, can only be held so as an exercise of the police power of the state over intrastate commerce to the end of inhibiting practices tending toward monopolization.

* * * * * *

" 'This Court is of the opinion that there is a valid distinction between "competitive price-cutting" and "intentionally destructive" price cutting, for the purpose of application of our constitutional principles. One of the declared intentions of the legislature in this Act is to safeguard the public against creation of monopoly. Not only is that within the scope of police power, but the exercise of that power is affirmatively enjoined upon the legislature by Section 103 of the Constitution. The factual examples of the Lindsey [Memphis Steam Laundry-Cleaners v. Lindsey, 192 Miss. 224, 5 So.2d 227] and Bastrop [Tooke & Reynolds v. Bastrop Ice & Storage Co., 172 La. 781, 135 So. 239] cases vividly show that intentional and deliberate cutting of prices below cost has been and can be a technique or weapon of monopolization. This Court cannot say that the declared intent is so far removed from the prohibited practice as to make it a mere masquerade, upon and from the very face of the Act itself.

" 'The the Court is further of the opinion that, in a business not affected with a pub-

lic interest, as that concept abides in the law of the State of Alabama, the legislature cannot regulate competitive pricing policies by declared standards of "fair competition," and undertake merely to umpire pricing practices with reference to such standards above the level of selling of commodities below cost with injurious intent in a business which may be susceptible of monopolization within a community.

" 'If mere "injury" to competitors were to serve as the basis for invoking the police power over prices, and was the only basis for the Act's operation, it would not be constitutional under our cases. All competition is intentional and all competitors necessarily injure all other competitors in the same field, except in rare cases of unrestricted and totally elastic markets. Competition is a struggle to win. Whatever one does to attract customers to him, in inelastic markets, is necessarily "injury" to others in the field. To set a criterion of cost does not help the situation. Whether a price cutter sells below cost of acquisition, or below that plus the cost of doing business, or below both these costs plus a profit so small as to scarcely yield a living for himself and his family, some injurious result would accrue to competitors who feel that they have a right to expect a reasonable profit. When a merchant air conditions or remodels his store, or provides parking, or exceptionally pleasant treatment for his customer, or more liberal credit than is ordinarily extended, it is done, in a loose sense, to "injure" competitors, who cannot or will not meet these conditions, though such merchant be a man of however much good will."

This court's conclusions were:

" '1. Under the Kelly-Hunter line of decisions in this state, the legislature cannot, consistently with Sections 1 and 35 of the State Constitution, regulate competitive prices or prohibit bona fide competitive price cutting in businesses not affected with a public interest, merely in the interest of fairness in competition.

" '2. The legislature may, however, exercise the police power of the state to inhibit creation of monopolies, whether the business concerned is affected with a public interest or not.

" '3. The selling of cigarettes below cost with intent to injure competitors and thereby destroy or substantially lessen competition may be a practice which tends toward creation of monopoly, and is within the police power of 'the state whether or not the business be affected with any public interest as such.

" '4. The Court cannot say, as a matter of law, on demurrer, that the provision contained in the first sentence of Section III(a) of the Unfair Cigarette Sales Act is unconstitutional, null and void, upon its face.

" '5. In order for the Act to fairly subserve the purpose of inhibition of monopoly, as distinguished from the purpose of merely procuring "fair" competitive prices as an end in itself, the Act must be construed so as to require the dual, conjunctive, or cumulative intent to injure competitors *and* destroy or substantially lessen competition.

" 'In other words, where the comma occurs between the words "competitors" and "destroy" in the first sentence of Section III(a) the conjunctive "and" must be understood. Otherwise, the Act would fall within the influence of the principles of the Kelly-Hunter cases, having an independent alternative based on mere injury to competitors, without more.

" 'If the phrase "To injure Competitors" is disjunctive from and alternative to the phrase "destroy or substantially lessen competition," then a violation could be predicated upon an intent to attract a single customer from a single competitor, without reference to that substantial lessening of competition which is the very essence of monopolistic tendency, or else a paradox would arise

which would say in effect that all competition tends toward monopoly. If an intend to injure a competitor were alone sufficient, then the additional phrase "destroy or substantially lessen competition" would be entirely redundant. The Court is of the opinion that there is an important difference between mere injury to a competitor and a destruction or substantial lessening of competition, and that they are not alternative or equivalent, and that the Act must be construed to require the intent to do both, rather than either.' "

In view of the language quoted supra from Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So.2d 252, it is difficult to understand why the five words were added by amendment to § 3 of the Act. Those words, "or with the effect thereof," remove all intent from the statute and renders unlawful not only "intentionally destructive price cutting" but also "competitive price cutting"; and "it is done, in a loose sense, to 'injure' competitors, who cannot or will not meet these conditions."

The five words change the statute to a price fixing law such as has been held unconstitutional in State v. Goldstein, 207 Ala. 569, 93 So. 308; City of Mobile v. Rouse, 233 Ala. 622, 173 So. 266, 111 A.L.R. 349; Lisenba v. Griffin, 242 Ala. 679, 8 So.2d 175, and Alabama Independent S. S. A. v. McDowell, 242 Ala. 424, 6 So.2d 502.

We see no occasion to repeat the consideration of the cases cited and discussed in *Simonetti,* supra. We conclude that the 1965 amendment to the Alabama Unfair Cigarette Sales Act, consisting of the words "or with the effect thereof" renders the Act unconstitutional on its face, because it incorporates in the Act the very vices which the opinion in *Simonetti,* supra, states would have made the original Act unconstitutional had they not been avoided, and renders the Act violative of Sections 1 and 35 of the Constitution of Alabama.

Appellee argues that the question of the constitutionality of the Act should not arise because this appeal could be decided on the ground that the trial court found, as it did, that "complainants were not only continuously selling cigarettes at retail in Jefferson and other counties in North Alabama at prices which were below cost to them as retailers under the Act, but that they also did so with the intent 'to injure competitors, destroy or substantially lessen competition.' The phrase 'or with the effect thereof' then has no possible field of operation in this case, as the required 'intent' has been established by the evidence."

But we cannot agree that the evidence supports such a finding. Neither have we found evidence to support the finding that "complainants' President, Mr. Scott, when testifying on the stand admitted that they sold cigarettes as 'loss leaders' at their retail filling stations." Appellee concedes in brief: "True, this particular witness (Scott) was not asked the direct question on this point and did not himself testify that the company was selling at a loss."

We think these findings were the result of being confused with Scott's testimony in support of his *proposal* that the court approve his proposed plan to sell a package at 1¢ below cost in connection with sales of gasoline and let the Tobacco Company be reimbursed from the profits of the Service Company in gasoline sales.

San Ann Service, Inc., was formed to sell gasoline. Scott is president of the corporation and holds 48% of the stock. His wife owns 1%, an employee owns 1% and Triangle Refineries owns the remaining 50%. The Service Company either owns or has under lease about fifty service stations in North Alabama. Most of the stations are operated by lessees of Service Company except one station at the home office at Sardis City in Etowah County. Under the lease agreements, the lessees agree to sell San Ann gasoline at a price

set by Service Company and they receive two cents for every gallon sold. All other parts of the enterprise are the responsibility of the lessee or operator and profits made from other activity, such as sales of soft drinks, belongs to the lessee or operator.

These lessees complained to Scott that they, to face competition from other service stations, were forced to sell cigarettes at cost, and they could not carry all brands because too much money was tied up in inventory which produced no profit.

In 1965, San Ann Tobacco, Inc., was organized with the same owners in the same proportion as San Ann Service, Inc., with Scott as president, and this business was engaged in the wholesale and retail cigarette business.

Tobacco Company has four or five wholesale accounts. The retail operation is through the lessees of the service stations under a consignment agreement. Tobacco Company places the cigarettes in the station and retains title with the lessees paying the proceeds from cigarette sales to Tobacco Company.

Tobacco Company has a warehouse which it leases from Service Company for $50.00 per month, undisputedly a reasonable rental. Tobacco Company has two employees that work in the warehouse. Their duties are devoted exclusively to Tobacco Company's operation. These duties include the receiving and sending of merchandise, the placing of local tax stamps on the merchandise and maintenance of the inventory. The records of Tobacco Company are kept in separate books in the office of Service Company. They are kept and maintained by Service Company employees. These employees are J. V. Knopp, who spends approximately 5% of his time on Tobacco Company's operations, Mrs. Becky Hyde, who spends approximately 10% of her time on Tobacco Company's operations, annd Mr. Scott, who spends approximately 5% of his time on Tobacco

Company's operations. These estimates were made by Mr. Scott, Mr. Knopp and the certified public accountant for the two firms, and are not disputed.

Service Company has in its employ two persons who are known as station auditors or supervisors. It is the duty of these persons to make regular checks on San Ann service stations where they audit the amount of gasoline on hand, receive the money for the amount that has been sold, check and furnish needed supplies at the station, make a general check of the operation and the premises for management purposes. These auditors each drive a station wagon owned by Service Company.

When Tobacco Company came into being it was arranged that the auditors would pick up the cigarettes at the warehouse and distribute the same to the stations. While there they make an audit of the cigarette inventory and collect for those that have been sold. About ten per cent of the auditor's time at the station is spent on Tobacco Company business.

No new auditors were employed when the Tobacco Company operation began and no additional office personnel were employed in Service Company's office. The only additional employees employed in the entire operation in order to put in Tobacco Company's operation was the two full time warehouse employees. None of the employees of Service Company received and increase in salary when they took on the duties which they perform for Tobacco Company.

The auditors do not make any extra trips or drive any additional mileage by virtue of the performance of their duties for Tobacco Company. All of the services which Service Company employees perform for Tobacco Company were absorbed in the existing overhead of Service Company. Tobacco Company, however, pays Service Company for the rendition of these services.

During six months of operation, Tobacco Company made a profit of over $33,000.00

out of gross sales of cigarettes of $568,916.-25.

For clarity and simplification, the parties at trial confined themselves principally to the price of Winston cigarettes in Jefferson County.

Tobacco Company buys all its cigarettes from City Wholesale Company in Birmingham. City Wholesale affixes all the legally required revenue stamps, state and local. In addition to the state tax, Jefferson County has a tax of 40¢ per carton and a local sales tax of 1½%.

The parties do not agree on many figures, but they are in agreement that if Tobacco Company is considered to be a retailer and not a wholesaler, which question we do not decide, the "basic cost" (price paid to wholesaler plus stamps) of a carton of cigarettes to Tobacco Company is $3.0072 per carton. Appellants then show that a package of cigarettes could be sold by Tobacco Company for a profit at 33¢ per pack because the total cost would be $3.2265 per carton or .322¢ per pack, while appellee contends that the pack must be sold for 34¢ because the total cost would be $3.39 per carton and 34¢ per pack.

The chief difference between their figures is the cost of doing business to be charged against Tobacco Company. Appellants contend, and adduced testimony in support, that its cost of doing business was less than the formula set up for figuring cost of doing business in § 4 of the Act, which provides in part "In the absence of proof of a lesser or higher cost of doing business by the retailer making the sale, the 'cost of doing business by the retailer' shall be presumed to be eight per centum (8%) of the 'basic cost of cigarettes' to the retailer."

Gene Burton, an employee of Ernst & Ernst, in Birmingham, had made an audit for Service Company every year since 1959 and had been familiar with Tobacco Company since its inception. His firm was requested to make a cost analysis of the operation of Tobacco Company. They used the records of the company for a six months period beginning January 1, 1966. This study, on five pages of the transcript, was introduced in evidence and the conclusion was that the total cost of operation by Tobacco Company was .1193¢ per carton. John L. Rhodes, manager of the Ernst & Ernst office, had been familiar with Service Company since 1960, was familiar with the cost analysis made by Mr. Burton for Tobacco Company and had discussed the preparation of it with Burton and the methods and procedures employed in the study were such as are generally accepted in the field of cost accounting.

As against this figure of .1193¢ per carton, appellee contended that the cost under the formula is .240576¢ per carton.

We will not belabor this opinion with further details as to the cost of doing business. Appellant Tobacco Company is charged with selling cigarettes, the only product it handles, at a loss. It is undisputed that Tobacco Company took an investment of $2,000, borrowed $40,000 to purchase inventory, and paid the loan off out of its profits in a year. No amount of figures or formulae can convince us that cigarettes can be sold at below cost or at cost and produce that kind of profit. There was also testimony that Tobacco Company's profit for one year was $70,000 before taxes.

It follows that we cannot agree with the finding that Tobacco Company was selling cigarettes "at prices below cost to it," and we cannot concur in the finding that Tobacco Company did not show that by proof its cost of doing business was lesser than the statutory "presumed" cost as established by the statutory formula.

We are fortified in this last statement by the holding in State v. Simonetti, Inc., 273 Ala. 571, 143 So.2d 444, where the first application of the law, prior to the 1965 amendment, was considered by this court. In that case, we affirmed the finding of the

trial court that: " * * * Also, if the respondent, (a cigarette wholesaler), under such a motion, (to dissolve an injunction), can establish that his selling is not below his actual cost as distinguished from theoretical cost, he would be similarly entitled to such dissolution. * * * On the matter of cost, the Court finds and concludes that respondent has demonstrated from the evidence that his sales are not below his actual cost. * * *"

In Simonetti, 273 Ala. 571, 143 So.2d 444, we also said:

" * * * The method employed in analyzing and breaking down the costs was the general acceptable accounting procedure. This was the testimony of the accountant referred to in the opinion of the trial court, and this evidence supports the finding of the trial court that appellee was not selling cigarettes below his actual cost."

■ We cannot agree with the finding that appellants came into equity with unclean hands. We have held that the doctrine of unclean hands can be applied to a litigant if he has been guilty "of unscrupulous practices, or overreaching, or has concealed important facts, even though not actually fraudulent, or been guilty of trickery, or taking undue advantage of his position, or other unconscientious conduct, then a court of equity may deny relief, although such may not constitute a defense at law." Harton v. Little, 188 Ala. 640, 65 So. 951; Weaver v. Pool, 249 Ala. 644, 32 So.2d 765, and cases there cited.

We do not think the evidence supports such a finding in the instant case.

Having decided that the statute, as amended, is unconstitutional on its face, we do not deem it necessary to respond to all the assignments of error argued in brief.

Reversed and remanded.

All the Justices concur except HARWOOD, J., not sitting.

## On Rehearing

MERRILL, Justice.

Counsel for appellee asks that the opinion be extended in order that two questions be answered: (1) Did our opinion in this case apply to the original "Unfair Cigarette Sales Act," Act No. 805, Acts of Alabama 1951, p. 1402, or only to Act No. 78, which contained the five words which rendered that Act unconstitutional, and (2) If Act No. 805 remains in full force and effect, are the other amendments contained in Act No. 78 effective, or is Act No. 78 unconstitutional in its entirety?

In Judson v. City of Bessemer, 87 Ala. 240, 6 So. 267, 4 L.R.A. 742, an amendment to § 38 of the Charter of Bessemer was held unconstitutional, and the court said, "The amending act, being unconstitutional and void, has no force or effect whatever. Section 38 remains unaffected, and as originally passed. Tims v. State, 26 Ala. 165."

In Frost v. Corporation Commission of Oklahoma, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483, it was said:

" * * * But since the amendment is void for unconstitutionality, it cannot be given that effect, 'because an existing statute cannot be recalled or restricted by anything short of a constitutional enactment.' Davis v. Wallace, [257 U.S. 478, 42 S.Ct. 164, 66 L.Ed. 325].

\* \* \* \* \* \*

"Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the Legislature which enacted it. Without an express repeal, a different Legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and,

therefore, powerless to work and a change in the existing statute, that statute must stand as the only valid expression of the legislative intent."

It appears to be uniformly held that where there is a valid act and an attempted but unconstitutional amendment to it, the original act is not affected, but remains in full force and effect. Annotation 66 A.L.R. 1483; Re Opinion of Justices, 269 Mass. 611, 168 N.E. 536, 66 A.L.R. 1477; 82 C.J.S., Statutes, § 270; 16 Am.Jur.2d, Constitutional Law, § 184.

Having held the amendment unconstitutional, it necessarily follows that the original enactment, Act No. 805, which we held to be constitutional on its face in Simonetti, Inc. v. State, 272 Ala. 398, 132 So.2d 252, remains unaffected and continues to be effective.

As to the second question, we hold that Act No. 78 was unconstitutional and was a nullity in toto. The Legislature evidently intended it to be considered in toto because the usual and customary "separability" or "severability" section was omitted from the amending statute.

We recognize that a separability clause should be given effect, where possible, to save a legislative enactment. Allen v. Walker County, 281 Ala. 156, 199 So. 2d 854; Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810. (We called it a severability clause in Hall v. Underwood, 258 Ala. 392, 63 So.2d 683 [16].)

Here, the absence of such a clause in Act No. 78, in connection with the fact that the part of the Act discussed in the original opinion was clearly of doubtful constitutionality, and as we stated—"it is difficult to understand why the five words were added by amendment to § 3 of the Act," give evidentiary strength to our conclusion that the Legislature intended for all the amendments in Act No. 78 to

stand or fall together, and thus, Act No. 78 has been stricken in its entirety.

Opinion extended and application for rehearing overruled.

LIVINGSTON, C. J., and SIMPSON and HARWOOD, JJ., concur.