519 So.2d 1275 (1987)
STATE of Alabama, ex rel. Chris N. GALANOS, etc.
v.
MAPCO PETROLEUM, INC.
85-725.
Supreme Court of Alabama.
December 18, 1987.
*1276 Thomas M. Galloway, Jr., Mobile, and W. Dennis Summers of Summers, Jones & Pendergast, Atlanta, Ga., for appellants.
G. Sage Lyons, J.P. Courtney III, and Charles L. Miller, Jr., of Lyons, Pipes & Cook, Mobile, for appellee.
Charles F. Norton, Jr., of Falkenberry, Whatley & Heidt, Birmingham, for amicus curiae Alabama Service Station Dealers' Ass'n.
ALMON, Justice.
The question presented in this appeal is the constitutionality of the Motor Fuel Marketing Act, Ala.Code 1975, § 8-22-1, et seq. ("the Act"). The State, through the District Attorney for Mobile County, brought this action against Mapco Petroleum, Inc., doing business as "Western" service stations in Mobile County. The complaint sought a civil penalty for Mapco's alleged violations of the Act and an injunction against further violations. The trial court granted Mapco's motion to dismiss the complaint, holding that the Act is unconstitutional.
The Act contains the following "Legislative declaration and intent," § 8-22-3:
"It is hereby declared that marketing of motor fuel in Alabama is affected with the public interest. It is hereby declared to be the legislative intent to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state. It is further declared that the advertising, offering for sale, or sale of motor fuel below cost or at a cost lower than charged other persons on the same marketing level with the intent of injuring competitors or destroying or substantially lessening competition is an unfair and deceptive trade practice. The policy of the state is to promote the general welfare through the prohibition of such sales. The purpose of the Motor Fuel Marketing Act is to carry out that policy in the public interest, providing for exceptions under stated circumstances, providing for enforcement and providing penalties."
The Act contains further provisions designed to carry out this intent.
Such an undertaking is, on its face, within the powers granted to the legislature under Article IV, § 103, of the Constitution of Alabama of 1901:
"Sec. 103. Regulation, etc., of common carriers, partnerships, associations, *1277 trusts, monopolies and combinations of capital.
"The legislature shall provide by law for the regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade, or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade or business."
This section has rarely been cited. Instead, this Court has developed a line of cases holding statutes unconstitutional, under the liberty interest protected by §§ 1 and 35 of the Constitution of 1901, as "price fixing" legislation or as excessive restraints upon the right to engage in trade. Of course, if § 103 were to conflict with §§ 1 and 35, then the latter provisions would govern, as noted by Justice Goldthwaite in an early case: "I consider the declaration of rights, as the governing and controlling part of the constitution; and with reference to this, are all its general provisions to be expounded, and their operation extended or restrained." In re Dorsey, 7 Port. 293, 359 (Ala.1838).
These provisions read:

"ARTICLE 1

"Declaration of Rights
"That the great, general, and essential principles of liberty and free government may be recognized and established, we declare:
"Sec. 1. Equality and rights of men.
"That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.
"...
"Sec. 35. Objective of government.
"That the sole and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."
The line of cases on this point can be traced to City Council of Montgomery v. Kelly, 142 Ala. 552, 38 So. 67 (1904). In that case, the Court held unconstitutional a license tax imposed upon the issuance of trading stamps. After citing §§ 1 and 35 of the Constitution, the Court observed:
"The liberty which is so sedulously guarded by the constitutions of the United States, and of this and other states comprehends more than the mere freedom from personal restraint. It includes the right to pursue any useful and harmless occupation, and to conduct the business in the citizen[`]s own way, without being discriminated against either by being prohibited from engaging in it or by being burdened with discriminative taxation....
"So long as his manner of conducting his business does not offend public morals and work an injury to the public, it is his constitutional right to pursue [his business], on terms equal to that allowed to others in like business, even though his methods may have a tendency to draw trade to him, to the detriment of competitors."
142 Ala. at 558-59, 38 So. at 69. Of course, Kelly involved no question of monopolies or § 103, being concerned only with license or privilege taxes.
The Court in State v. Goldstein, 207 Ala. 569, 93 So. 308 (1922), relied on the constitutional protection of liberty and struck down a "profiteering" law penalizing the sale of goods at a "fraudulent or grossly excessive price." The Court noted that the law was "operative without regard to any conditions of scarcity or monopoly," and that there was no contention that "the business of selling useful and harmless commodities... is or can be affected with a public interest, so long as trade is free and unaffected by monopolistic combinations, or artificial restraints, or emergency conditions which involve temporarily the health or safety of the public." Id., 207 Ala. at 570, 93 So. at 311.
*1278 With Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), there came a shift in the analysis of such cases under federal law, with the United States Supreme Court holding that economic regulations would withstand a challenge under the due process clause[1] of the Fourteenth Amendment to the Constitution of the United States unless "arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Id., 291 U.S. at 539, 54 S.Ct. at 517. See the discussion of Nebbia in Mount Royal Towers v. Alabama Bd. of Health, 388 So.2d 1209 (Ala. 1980).
This Court came to a result similar to that in Nebbia when it decided Franklin v. State ex rel. Alabama State Milk Control Bd., 232 Ala. 637, 169 So. 295 (1936). The Court analyzed the Milk Control Board Act in terms of whether it was a reasonable exercise of the police power; observed that the question of whether that act offended the Fifth and Fourteenth Amendments to the Constitution of the United States was foreclosed by Nebbia, which involved a substantially identical New York statute; and expressed the state constitutional question as, "Was it within legislative competence, where a business or industry is affected with a public interest, to regulate that industry to the extent of fixing prices?" Id., 232 Ala. at 642, 169 So. at 299. The Court noted that the business of producing and selling milk "is a business affected with a public interest, which is tantamount to saying `subject to the exercise of the police power,' and to regulation and control, even to the extent of fixing prices." Id., citing Nebbia.
Franklin addressed several subsidiary constitutional questions not pertinent here. No mention was made of §§ 1 and 35, or of § 103 beyond including it in a list of sections raised by the appellant as violated by the Milk Control Board Act. The Franklin Court distinguished State v. Goldstein, supra, without much discussion, other than to point out the language, quoted above, stating that the act at issue in Goldstein was not predicated on any questions of monopoly or scarcity.
After Franklin came a series of cases making points pertinent to the present appeal. In both City of Mobile v. Rouse, 233 Ala. 622, 173 So. 266 (1937), and Lisenba v. Griffin, 242 Ala. 679, 8 So.2d 175 (1942), the Court struck down legislation setting minimum prices that barbers could charge for their services. Rouse relied largely upon Goldstein in striking the law as an infringement upon the liberty to set prices for one's own services. It distinguished Franklin by observing that personal services are not affected with a public interest unless rendered in a business so affected or in an official capacity. Lisenba held that the ordinance was void because it was in conflict with a general law on the same subject. Further, it cited Rouse, supra, and McDowell, infra, in observing, obiter dictum, that the ordinance violated § 1 of the Constitution.
In a pair of cases, the Court struck down a law requiring the posting of prices at gasoline service stations and penalizing the sale of gasoline below the posted price. Alabama Independent Service Station Ass'n v. McDowell, 242 Ala. 424, 6 So.2d 502 (1942); Alabama Independent Service Stations Ass'n v. Hunter, 249 Ala. 403, 31 So.2d 571 (1947). In McDowell, the Court held that the law violated §§ 1 and 35, citing Kelly, Goldstein, and Rouse, supra. The Court stated that "The operation of filling stations for the retail sale and delivery *1279 into motor vehicles of motor fuels for the generation of power, is not a business affected with `a public interest.' McDowell, 242 Ala. at 429, 6 So.2d at 506. Hunter merely reaffirmed and clarified the holding in McDowell.
Similarly, a pair of cases addressed the constitutionality of the Unfair Cigarette Sales Act. Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So.2d 252 (1961); San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803 (1968). Those two cases established precedents that seriously bring into question the constitutionality of the Motor Fuel Marketing Act. The proposition established in Simonetti and Hamm may be paraphrased thus: In attempting to regulate monopolies under § 103, the legislature impermissibly infringes upon the liberty interests protected by §§ 1 and 35, at least with regard to businesses not affected with a public interest, if it prohibits selling below cost without requiring that the sale be made with intent to destroy or substantially lessen competition, even if it requires that the sale be made with that effect.
The Court in Simonetti adopted an extensive opinion from the trial court that dealt with the body of law on the subject and how that law applied to the statute at hand. Section III(a) of the cigarette act, as quoted in Simonetti, 272 Ala. at 399, 132 So.2d at 254, read:
"It shall be unlawful for any wholesaler or retailer, with intent to injure competitors, destroy or substantially lessen competition, to advertise, offer to sell, or sell at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer as the case may be."
Simonetti explicitly refrained from relying on Nebbia and Franklin:
"In Nebbia, it was said `the phrase affected with a public interest can in the nature of things mean no more than that an industry, for adequate reason, is subject to control for the public good.' The writer rather thinks that the Franklin decision retained the earlier and narrower concept of affectation with a public interest, holding in effect that the importance of the dairy industry is such as to virtually constitute it a `public utility.' And, of course, the regulatory consequences of affectation with a public interest are much broader than those imposed in a `sale below cost' statute. When an industry falls within the doctrine of the Franklin case, maximum, minimum, or stated prices may be fixed, the method of conducting the business very closely regulated, and newcomers be prohibited from entering the field. In short, the legislature may regulate such a business in the same fashion that it does common carriers by motor truck, etc. If this case turned upon the question of whether or not the merchandising of tobacco was affected with a public interest, the law would probably be unconstitutional on its face. But it would be an unusual idea to say that the power of the legislature over monopoly was limited to businesses affected with a public interest, and to say that the legislature may not prohibit one individual from deliberately injuring another individual who is in competition with him because their businesses happen to involve commodities of little importance to the public at large."
272 Ala. at 402, 132 So.2d at 257 (emphasis added).
The Court concluded that the act could not be constitutional if the only adjunct to the sale below cost was the intent to injure competitors. This conclusion was set out as follows:
"1. Under the Kelly-Hunter line of decisions in this state, the legislature cannot, consistently with Sections 1 and 35 of the State Constitution, regulate competitive prices or prohibit bona fide competitive price cutting in businesses not affected with a public interest, merely in the interest of fairness in competition.
"2. The legislature may, however, exercise the police power of the state to inhibit creation of monopolies, whether the business concerned is affected with a public interest or not.

*1280 "3. The selling of cigarettes below cost with intent to injure competitors and thereby destroy or substantially lessen competition may be a practice which tends toward creation of monopoly, and is within the police power of the state whether or not the business be affected with any public interest as such.
"...
"5. In order for the Act to fairly subserve the purpose of inhibition of monopoly, as distinguished from the purpose of merely procuring `fair' competitive prices as an end in itself, the Act must be construed so as to require the dual, conjunctive, or cumulative intent to injure competitors and destroy or substantially lessen competition.
"In other words, where the comma occurs between the words `competitors' and `destroy' in the first sentence of Section III(a) the conjunctive `and' must be understood. Otherwise, the Act would fall within the influence of the principles of the Kelly-Hunter cases, having an independent alternative based on mere injury to competitors, without more.
"If the phrase `To injure Competitors' is disjunctive from and alternative to the phrase `destroy or substantially lessen competition,' then a violation could be predicated upon an intent to attract a single customer from a single competitor, without reference to that substantial lessening of competition which is the very essence of monopolistic tendency, or else a paradox would arise which would say in effect that all competition tends toward monopoly. If an intent to injure a competitor were alone sufficient, then the additional phrase `destroy or substantially lessen competition' would be entirely redundant. The Court is of the opinion that there is an important difference between mere injury to a competitor and a destruction or substantial lessening of competition, and that they are not alternative or equivalent, and that the Act must be construed to require the intent to do both, rather than either."
Id., at 408, 132 So.2d at 262-63.
Before examining this intent requirement more closely and determining its effect, if any, on the Motor Fuel Marketing Act, we deem it pertinent to conclude our survey of the cases on point.
Hamm, supra, involved an amendment to the Unfair Cigarette Sales Act that added, after "with intent to injure competitors, destroy or substantially lessen competition," the words "or with the effect thereof." The Court quoted extensively from Simonetti and held that the amendment was unconstitutional, with the following rationale:
"Those words, `or with the effect thereof,' remove all intent from the statute and renders [sic] unlawful not only `intentionally destructive price cutting' but also `competitive price cutting'; and `it is done, in a loose sense, to "injure" competitors, who cannot or will not meet these conditions' [quoting Simonetti ].
The five words change the statute to a price fixing law such as has been held unconstitutional in [Goldstein, Rouse, and McDowell, supra ].
"... [The amendment] renders the Act unconstitutional on its face, because it incorporates the very vices which the opinion in Simonetti, supra, states would have made the original Act unconstitutional had they not been avoided."
Hamm, supra, 283 Ala. at 402, 217 So.2d at 806-07. The Court then applied the act as it existed prior to the amendment, finding that the appellant's evidence proved that it had not sold below cost.
We must take Hamm as holding that the legislature cannot constitutionally prohibit "selling below cost with the effect of injuring competitors and destroying or substantially lessoning competition," because this "and" could as easily have been read into the amended statute as it was into the original. Thus, while Simonetti emphasized that the legislature must make a bona fide attempt to prevent monopolization, Hamm focused on the intent element from Simonetti, without further analysis, and made it an absolute requirement. We note that we propose to discuss this intent requirement further, later in this opinion, and also that this reasoning applies, in Simonetti's *1281 own terms, only to a business not affected with a public interest.
The Court decided two cases in this area after Simonetti and prior to Hamm: Bulova Watch Co. v. Zale Jewelry Co., 274 Ala. 270, 147 So.2d 797 (1962); and McCrory v. Wood, 277 Ala. 426, 171 So.2d 241 (1965).
In Bulova Watch Co. the Court held that the Fair Trade Regulations, Ala.Code 1940, Tit. 57, §§ 77-83, were unconstitutional. The Court stated: "Our cases make clear the rule that before the legislature may regulate competitive prices or prohibit bona fide price cutting merely in the interest of fairness in competition, the business regulated must be affected with a public interest." 274 Ala. at 271, 147 So.2d at 798, citing §§ 1 and 35, and many of the cases discussed above. The Court noted, "Even where the legislature has declared a business to be affected with a public interest, this does not pretermit an examination of the validity of the regulation," 274 Ala. at 272, 147 So.2d at 798, citing Lisenba v. Griffin, supra. The Court held that "the business sought to be controlled is not one wherein the `public interest' is affected, and therefore the legislation is outside the scope of the state's police power." 274 Ala. at 272-73, 147 So.2d at 799.[2]
Bulova Watch Co. pretermitted the whole question of prevention of monopoly and requirement of an intent to destroy competition with the following qualification: "This opinion is not concerned with the power of the legislature over a monopolistic business to [sicor?] one affected with a `public interest.' Upon this we express no opinion as that question is not before the Court." 274 Ala. at 272, 147 So.2d at 799.
In McCrory v. Wood, supra, the practice of optometry was held subject to regulation by the legislature under the police power, and the delegation of regulatory authority to a board composed of members of the professional association of optometrists was held to be constitutional.
The next case on the constitutionality of economic regulations was Rabren v. City Wholesale Grocery Co., 289 Ala. 274, 266 So.2d 882 (1972). This case again addressed the Unfair Cigarette Sales Act. The Court struck a provision requiring that the full face value of tax stamps be included as part of cost in computing sales below cost. The appellee purchased tax stamps at a discount from the state and the county, so its actual cost was less than what would have been computed under the statute.
Estell v. City of Birmingham, 291 Ala. 680, 286 So.2d 872 (1973), revisited this body of law in striking down an ordinance prohibiting "scalping" football or other entertainment tickets, that is, reselling them at higher prices than those charged by the managers of the events. The Court examined the "affected with a public interest" test as applied in Franklin and determined that the ordinance could not be sustained on that basis. The opinion then cited Simonetti `s holding that "The legislature can also prohibit sales below cost, designed to injure or to destroy the business of a competitor," 291 Ala. at 683, 286 So.2d at 874. Estell then quoted from Bulova Watch Co. and Goldstein and cited Rouse, Lisenba, and McDowell. Without further discussion, the Court upheld the decision of the Court of Criminal Appeals invalidating the ordinance.
In 1980, this Court upheld the Certificate of Need Act in Mount Royal Towers, Inc. v. Alabama Board of Health, 388 So.2d 1209 (Ala.1980). That opinion touched upon some of the cases discussed above, quoted from Nebbia, and criticized the "affected with a public interest" test stemming from Franklin. As we now read these cases, it appears that the Mount Royal opinion misconstrues Simonetti as holding that the sale of cigarettes is affected with a public interest. If that had been the case, the test would certainly be an arbitrary or conclusory one, as Mount Royal concludes. In truth, only the dairy business has explicitly been held to be affected *1282 with a public interest. It might be said that optometry was implicitly so held in McCrory.
Mount Royal involved regulation of hospital facilities and so was more like Franklin and McCrory than like the series of cases in which the legislature attempted to prevent sales below cost or otherwise to regulate prices. Thus, with prices not being at issue, Mount Royal disregarded the Simonetti holding that the legislature may attempt to prevent monopolization by prohibiting sales below cost with the intent to destroy competition.
Instead, Mount Royal disapproved the "affected with a public interest" test and attempted to restate generally the standard for review of economic regulations:
"We hold that, where legislation affects protected economic interests or liberties, it must be tested against the public purpose sought to be served, and there must be a legitimate bona fide relationship between a permissible public purpose and legislation passed to further that end. Or, stated differently, there must be in fact a demonstrable public need to be balanced against protected interests impaired by legislation, and the balance struck between individual rights and the public welfare must be reasonable and fair. Factors which may be taken into account in this assessment are the degree of the burden which the legislation imposes, the importance of the right infringed upon, and the gravity of the conditions with which the legislation attempts to deal. This is not a departure from the rule followed in earlier cases, but merely a rearticulation of the test. Franklin itself, which established the affected with a public interest test, defined the issue in determining the validity of economic regulation attacked upon constitutional grounds to be `whether the relief intended to be given is of a character appropriate to the existing emergency, and reasonably intended to protect against, or to alleviate, the calamitous conditions prevailing or threatened.' 169 So. at 298."
388 So.2d at 1214-15. The Court examined several law review articles on substantive due process in arriving at this test.
Legislation regulating a business or profession under the police power may be distinguished from legislation designed to implement § 103's mandate to prevent monopolization. The two fields may overlap, and it may be appropriate to apply the same standard to all assertions that legislation violates a party's liberty to engage in a business or occupation as he chooses. Before we reaffirm the Mount Royal test and explicitly hold that it supersedes the Simonetti "intent to destroy competition" test as well as the Franklin "affected with a public interest" test, however, we shall reexamine the law from a more general viewpoint.
We begin by ascertaining the source of the Simonetti "intent" requirement, as we mentioned we would do when we summarized that case. Here is the pertinent language:
"The essential validity of this sort of legislation seems to have been otherwise upheld without exception, where the sales below cost are only made unlawful when coupled with a specific intent to destroy competition. See the numerous cases cited in [Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal.2d 634, 82 P.2d 3 (1938) ] 118 A.L.R. 486, 506; [Commonwealth v. Zasloff, 338 Pa. 457, 13 A.2d 67 (1940) ] 128 A.L.R. 1120, 1126; 87 C.J.S. [Trade-Marks, Trade-Names, and Unfair Competition § 244 and § 245] p. 716, Sections 244 and 245 (1954)."
272 Ala. at 401, 132 So.2d at 255-56. The bracketed cases appear thus in the original; we have added only the dates.
The act held constitutional in Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal.2d 634, 82 P.2d 3 (1938), required proof of intent to destroy competition, and the defendant was shown to have sold below cost with such intent. The court addressed the constitutionality in terms of a means-end analysis, relying extensively on Nebbia and the similar analysis therein. The court held that the prevention *1283 of monopolization was a legitimate end toward which the police power could be employed and discussed at length the question of whether the prohibition against destructive below-cost selling was reasonably designed to accomplish that purpose. Citing numerous arguments both for and against this method of control of monopolies, and discussing cases on point, the court concluded that the legislature could reasonably have determined that the chosen means would contribute to the anti-monopoly end: "The statute must be held to be a reasonable attempt on the part of the state to accomplish a valid object." 82 P.2d at 17.
In rejecting defendant's contention that the statute prohibited sales below cost without reference to intent, Wholesale Tobacco conceded:
"It would certainly add to the weight of appellant's argument on the main issue if the statute omitted intent as an integral part of the act prohibited. It is one thing, from a legal standpoint, to prohibit sales below cost engaged in for the purpose of injuring competitors and destroying competition, and quite another to merely prohibit all such sales regardless of intent. It may well be that an absolute prohibition regardless of intent would be unreasonable. See Fairmont Creamery Co. v. Minnesota, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893, 52 A.L.R. 163. However, it is our opinion that section 3, properly interpreted, requires the designated intent before selling below cost is prohibited."
Id. Thus, the California court clearly considered the intent element as an important consideration in determining whether the means employed to fight monopoly were reasonable.
In the other case cited in Simonetti, the Pennsylvania Supreme Court held unconstitutional a "sale below cost" statute that made no reference to intent:
"If the Act confined itself to prohibiting sales below cost when intended to destroy competition, it would undoubtedly be valid, as has been held in various jurisdictions where such acts have been enacted with that qualification.... The opinions of the courts in those cases emphasized the fact that the statutes there under consideration made criminal[[3]] only such sales as were designed for the suppression of competition or other predatory purposes, and the means employed by those statutes were therefore reasonably related to their objective.... It is only when the object of price cutting is sinister,to destroy a competitor by suffering a temporary loss in order to gain an ultimate monopoly ..., or to defraud the public by seducing them into the purchase of other goods at an exorbitant pricethat the selling of goods at less than cost may constitute an economic or social evil. The Pennsylvania act, therefore, is arbitrary, and the means which it employs are grossly out of proportion to the object which it seeks to attain."
Commonwealth v. Zasloff, 338 Pa. 457, 13 A.2d 67, 70 (1940) (citations omitted).
From these quotations it can be seen that both courts were employing a means-end analysis and emphasized the intent element as a crucial factor in determining the reasonableness of the means. The cases cited in the annotations bear out this conclusion. See Annot., 118 A.L.R. 506 (1939); Annot., 128 A.L.R. 1126, 1128-29 & 1136-37 (1940). Some of the cases cited in those annotations found statutes constitutional that allowed a violation to be premised upon sales below cost with the effect, but not necessarily the intent, of injuring the public, competitors, or competition. Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co., 178 Md. 38, 12 A.2d 201 (1940); McElhone v. Geror, 207 Minn. 580, 292 N.W. 414 (1940); Rust v. Griggs, 172 Tenn. 565, 113 S.W.2d 733 (1938).
*1284 We also glean from these annotations that most states do not recognize the distinction between injury to competitors and destruction of competition that the Simonetti court emphasized; rather, they presume the statutorily prohibited injury to competitors to be a malicious or invidious one, rather than the inevitable "injury" to a competitor's business occasioned by attracting customers to one's own business.
These annotations have been brought current by another at 41 A.L.R. 4th 612 (1985). The cases cited therein have continued to require an intent element. Baseline Liquors v. Circle K Corp., 129 Ariz. 215, 630 P.2d 38 (Ct.App.1981), cert. denied, Skaggs Drug Centers, Inc. v. Baseline Liquors, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 387 (1981), held that intent was an essential element in order to find a criminal violation of the statute, even though the statute itself read in the disjunctive, "with the intent or effect." The annotation reports that Dooley's Hardware Mart v. Food Giant Markets, Inc., 21 Cal.App.3d 513, 98 Cal.Rptr. 543 (1971), read an intent requirement from a general provision of the statute into a more specific one; and that Twin City Candy & Tobacco Co. v. A. Weisman Co., 276 Minn. 225, 149 N.W.2d 698 (1967), held a statute unconstitutional because it did not allow a defendant an opportunity to prove the sale occurred without predatory intent or harmful effect.
This Court in Mount Royal, supra, cited several law review articles generally on the subject of substantive due process, including: Howard, "State Courts and Constitutional Rights in the Day of the Burger Court," 62 Va.L.Rev. 873 (1976); Hetherington, "State Economic Regulation and Substantive Due Process of Law," 53 N.W. U.L.Rev. 226 (1958); and Struve, "The Less-Restrictive-Alternative Principle and Economic Due Process," 80 Harv.L.Rev. 1463 (1967).
In addition to those articles, we have found the following instructive on the subject: Galie, "The Other Supreme Courts: Judicial Activism Among State Supreme Courts," 33 Syracuse L.Rev. 731, 772-79 (1982); Kirby, "Expansive Judicial Review of Economic Regulation Under State Constitutions: The Case for Realism," 48 Tenn.L.Rev. 241, 252-61 (1981); Note, "State Economic Substantive Due Process: A Proposed Approach," 88 Yale L.J. 1487 (1979).
After due reflection, we determine that the following standard should be applied in review of a challenge such as this one to the constitutionality of legislation prohibiting sales below cost in the attempt to prevent monopolization: Generally speaking, the test is whether the legislation is designed to accomplish an end within legislative competence and whether the means it employs are reasonably designed to accomplish that end without unduly infringing upon protected rights. This is essentially the same test as that enunciated in Mount Royal, but the factors to be considered in a "sale below cost" case such as this are somewhat different from those in a "regulation" case such as Mount Royal.[4] Because the stated end in a case such as this is normally that of preventing monopoly with the accompanying scarcity, high prices, and other harmful effects of monopolization, and because this purpose is specifically within the powers granted to the legislature in § 103 of the Constitution of 1901, the validity of the end will not usually be the critical question in such a case. With respect to the means used, the legislation must be reasonably designed to accomplish its purpose, and to do so with no more infringement on individual rights than is reasonably necessary. Specifically, in these "sale below cost" cases, the primary issue will be whether the legislation too broadly imposes restrictions on individuals' liberty to conduct their business as *1285 they choose. If the act penalizes innocent acts not reasonably related to the problem of monopolistic practices or other deceptive, disruptive, or destructive price cutting, the act strikes too broadly.
With these considerations in mind, we turn to the Motor Fuel Marketing Act. We quote in full § 8-22-2, which, together with § 8-22-3, quoted at the beginning of this opinion, tends to establish the legislature's purpose in enacting the Act:
"§ 8-22-2. Legislative findings.
"The legislature makes the following findings with respect to the marketing of motor fuel in Alabama:
"(1) Marketing of motor fuel is affected with the public interest.
"(2) Unfair competition in the marketing of motor fuel occurs whenever costs associated with the marketing of motor fuel are recovered from other operations, allowing the refined motor fuel to be sold at subsidized prices. Such subsidies most commonly occur in one of three ways: when refiners use profits from refining of crude oil to cover below normal or negative returns earned from motor fuel marketing operations; where a marketer with more than one location uses profits from one location to cover losses from below-cost selling of motor fuel at another location; and where a business uses profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel.[5]
"(3) Independent motor fuel marketers (i.e., dealers, distributors, jobbers and wholesalers) are unable to survive predatory subsidized pricing at the marketing level by persons when all of an independent's income comes from marketing operations.
"(4) Subsidized pricing is inherently predatory and is reducing competition in the petroleum industry, and if it continues unabated, will ultimately threaten the consuming public."
Because this case concerns only the retail marketing of motor fuel, we do not address the questions regarding refiners.
We note the finding and the declaration that marketing of motor fuel is affected with a public interest. Because this legislation does not undertake the extensive regulation that requires a finding of affectation with a public interest, we pretermit consideration of whether to overrule McDowell and Hunter and to acquiesce in the legislature's finding and declaration. We do note, however, that events of the past 14 years, beginning with the 1973 oil embargo conducted by the Organization of Petroleum Exporting Countries, lend credence to this finding and declaration.
Further, we note the references to "fair competition" and compare the holdings, in the cases we have discussed, that the legislature may not engage in price fixing in a business not affected with a public interest merely to protect fair competition. See, e.g., Bulova Watch Co., supra. Because the tenor of this Act is to prevent monopolization and because the motor fuel marketing business has the potential for monopolization, we construe the statute as prohibiting sales below cost that tend to destroy or substantially lessen competition, not just those that are "unfair."
The only requirement of an anti-competitive intent to be found in the Act is in § 8-22-3, the "Legislative declaration and intent" section quoted at the beginning of this opinion. That section declares that the sale of motor fuel below cost "with the intent of injuring competitors or destroying or substantially lessening competition is an unfair and deceptive trade practice" (emphasis added).[6] This disjunctive immediately raises the question of whether Simonetti's *1286 reasoning requires a finding that the Act impermissibly penalizes for the ordinary injury to competitors that results from successful efforts to draw customers to one's own business. We reject such a conclusion, and hold now that the legislature may prohibit sales below cost made with the intent to injure competitors even in that sense. The cases make clear that such an intent is not innocent, but can clearly be linked either to the deceptive practice of luring customers by use of "loss leaders" while maintaining high prices on other items or to the destructive practice of developing clientele and diminishing competitors' business while temporarily suffering a loss in anticipation of higher profits after competitors have been driven out of business.
The question remains whether this intent provision of § 8-22-3 applies to the actual penalty provisions:
"§ 8-22-6. Certain below cost fuel sales prohibited.
"It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition."
"§ 8-22-9. Unlawful acts generally.
"It shall be unlawful under this section:
"(1) For any person engaged in commerce in this state to sell or offer to sell motor fuel at wholesale or retail, as the case may be, where the effect is to injure competition.
"(2) For any person, where the effect is to injure competition, to offer a rebate, to offer to give a rebate, [or] to offer a concession of any kind in connection with the sale of motor fuel.
"(3) For any retailer to induce or attempt to induce or to procure or attempt to procure the purchase of motor fuel at a price less than cost to wholesaler. Any person who violates any provision of this section shall be subject to the provisions and penalties of this chapter."
These provisions must be read in pari materia, and to the extent that the provisions of § 8-22-9 may be read to penalize acts without a finding of both a sale below cost and an injurious effect upon competition, such a construction is disapproved. To read these provisions literally and in isolation might well lead to a conclusion that they are unreasonably overbroad or void for vagueness, even under an analysis pursuant to the "affected with a public interest" test.
It may readily be seen that the legislature has in explicit terms prohibited only sales below cost where the effect is to injure competition. We think that to read the intent provision of § 8-22-3 into these provisions so as to place a burden on the State to prove intent would be manifestly contrary to the terms of the Act. However, we do think that the various provisions of the Act can be read together in a way that will save their constitutionality. It is quite consonant with the spirit and terms of the Act to construe it as providing that the State proves a prima facie case when it proves a sale below cost and an injurious effect on competition, and yet as allowing the defendant to prove lack of a harmful intent either in avoidance of liability or in mitigation of any penalty, as the trier of fact shall determine.
The legislature has provided several exceptions that may be categorized as defenses of "no injurious intent":
"§ 8-22-13. Competitive sales, etc.
"(a) ... Any retailer may advertise, offer to sell, or sell motor fuel at a price made in good faith to meet the price of a competitor who is selling the same article at cost to the said competing retailer as defined in this chapter. The price of motor fuel advertised, offered for sale, or sold under the exceptions specified in section 8-22-12 shall not be considered the price of a competitor and shall not be used as a basis for establishing prices below cost, nor shall the price established at a bankrupt sale be considered the *1287 price of a competitor within the purview of this section."
The exceptions stated in § 8-22-12 are (1) isolated transactions not in the usual course of business, (2) bona fide clearance sales for discontinuing trade in such fuel, (3) imperfect or damaged fuel, (4) liquidation of a business, and (5) sales by a fiduciary or other officer under the direction of a court.
Considering the "intent" provision of § 8-22-3, we deem it consistent with these provisions to allow a general defense of lack of injurious intent even if the facts do not specifically fit one of the stated exceptionsfor example, an honest mistake in calculations. Such a defense would of course be a matter for the trier of fact and would be given such weight as the trier of fact deems appropriate. With such a construction, the statute may be held constitutional on the ground that it does not too broadly penalize conduct protected by the Declaration of Rights.
Other provisions in the Act relate to the method for calculating cost, which includes the cost of doing business (§ 8-22-4, et al.); to fines of up to $10,000 per day and injunctions for violations (§ 8-22-16); to actions brought by persons suffering injury (§ 8-22-17); and to prima facie showings by such plaintiffs of violations by defendants (§ 8-22-18). Mapco presents arguments relating to various of these provisions, but the only one we find to present a substantial question as to the constitutionality of the Act regards the prima facie provisions of § 8-22-18:
"In any action brought under sections 8-22-15, 8-22-16 or 8-22-17, upon a prima facie showing of a violation, the burden of rebutting the prima facie case thus made by showing justification shall shift to the defendant. A prima facie showing of a violation shall be constituted if the plaintiff shows:
"(1) That the plaintiff's purchase price from a refiner or wholesaler is greater than said refiner's transfer price; or
"(2) That the plaintiff's purchase price from a refiner or wholesaler plus the plaintiff's cost of doing business is greater than said refiner's or wholesaler's retail posted sales price; or
"(3) That the plaintiff's basic cost of motor fuel plus the plaintiff's cost of doing business is greater than the posted sales price at a retail location of a competitor, within the plaintiff's marketing area, suspected of selling motor fuel in violation of this chapter."
The trial court expressed concern in its order that one marketer could artificially place another in violation of the Act by raising his own cost of doing business. We agree with the trial court that these provisions are unconstitutional. They admit of the possibility that one marketer could sue another and make out a prima facie case simply by proving that the defendant marketer sold below the plaintiff marketer's cost. A prima facie case is a legally sufficient case, and to penalize a person on no more basis than this would not be rationally related to the goal of safeguarding against monopolies. Even the fact that the defendant can rebut the prima facie case does not save these provisions. To subject a defendant to the expense and risk of rebutting such an innocuous charge would interfere too greatly with ordinary, desirable competition and with the defendant's liberty interest in legally conducting his business without being subject to such harassment.
These provisions do not support a wholesale invalidation of the Motor Fuel Marketing Act, however, because they are severable. The Act contained a severability clause, which has not been reproduced in the Code. Ala.Acts 1984, No. 84-260, § 19. Thus, the prima facie provisions do not provide a ground for upholding the judgment of the trial court.
We hold that the Act, as construed and with certain provisions severed, is constitutional against the challenges made in this case,[7] and that the trial court erred in *1288 dismissing the complaint. The judgment is therefore reversed and the cause is remanded.
REVERSED AND REMANDED.
MADDOX, JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
TORBERT, C.J., concurs specially.
BEATTY, J., concurs in the result.
TORBERT, Chief Justice (concurring specially).
I believe it is important to explain why I concur in the opinion. The opinion could be read as reducing, if not eliminating, the "intent" requirement that has been found in our older decisions. See Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So.2d 252 (1961); San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803 (1968). If I believed this to be the effect of the Court's opinion, I would dissent, but I do not believe that to be its effect.
The opinion adopts a means-ends analysis similar to that employed in Mount Royal Towers, Inc. v. Alabama Board of Health, 388 So.2d 1209 (Ala.1980). While Mount Royal criticizes cases such as Simonetti, it does not expressly overrule them, and the majority opinion in the present case correctly notes that Mount Royal misconstrued Simonetti as being an "affected-with-a-public-interest" case. Adoption of a means-ends analysis is not inconsistent with requiring an intent element. The opinion recognizes that courts in other states, in considering "sale below cost" statutes, have required an intent element while employing a means-ends analysis. It is stated in 41 A.L.R. 4th 612, 619 (1985) that "[i]t is also required that any sale below cost be made with anticompetitive intent before a statute prohibiting such a practice will be applicable."
The opinion makes it clear that "[i]f the act penalizes innocent acts not reasonably related to the problems of monopolistic practices or other deceptive, disruptive, or destructive price cutting, the act strikes too broadly." (Emphasis added.) It goes on to say, "we construe the statute as prohibiting sales below cost that tend to destroy or substantially lessen competition, not just those that are `unfair.'"
While the opinion never explicitly states that the means-ends analysis adopted to test the constitutionality of a statute includes an intent element, neither does it explicitly reject the necessity of proving an intent, in spite of the fact that it recognizes that an intent element is required in most, if not all, other jurisdictions. I find this to be significant in my conclusion that an intent element is implicitly embraced in the new test.
The ambiguity that exists in the opinion arises in two areas. The first is where the opinion rejects the Simonetti reasoning that a statute must require a showing of both intent to injure competitors and intent to destroy or substantially lessen competition. As is pointed out, the need to address this issue arose due to the use of the disjunctive rather than the conjunctive in Code 1975, § 8-22-3. As I read the opinion, it merely states that the two phrases are substantially the same and rejects the Simonetti conclusion that "intent to injure competitors" speaks to ordinary competition. In other words, the majority opinion does not lessen the burden imposed upon the state for proof of a violation but holds that the requirement of intent to injure competitors is substantially similar to the requirement of intent to destroy or substantially lessen competition.
Second, the opinion notes that the penalty provisions of the act in § 8-22-6 and § 8-22-9 do not include an intent element but, instead, prohibit certain conduct when the "effect is to injure competition." (Emphasis added.) In light of the requirement that such acts are constitutional only if there is an "intent" element, we could either strike down the statute as unconstitutional for prohibiting acts that have certain effects rather than prohibiting acts accompanied with the requisite intent or uphold the statute by reading an intent element into it.
The majority opinion takes the latter view. I find this approach to be appropriate *1289 in light of the legislature's clear intent to prohibit conduct where the actor had the intent to injure competitors or destroy or substantially lessen competition. Code 1975, § 8-22-3. Therefore, it is appropriate to construe the penalty provisions to have an intent element. However, rather than requiring the state to show such an intent as part of its prima facie case, I construe the opinion to say that such an intent will be presumed upon a showing that the acts have the effect of injuring competition. The defendant can rebut that presumption by proving the lack of intent. With respect to the majority opinion's observation that the defendant can prove lack of a harmful intent either in avoidance of liability or in mitigation of any penalty, if a case arose where the evidence showed conclusively that the defendant had no harmful intent, I believe that no liability could attach.
NOTES
[1] The due process clause of the Fourteenth Amendment to the Constitution of the United States provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Two sections of the Alabama Declaration of Rights contain "due process" language, but one, § 6, relates specifically to criminal prosecutions, and the other, § 13, relates to remedies for injuries done. Thus, the jurisprudence in Alabama has derived the substantive protection of a liberty interest in economic matters from §§ 1 and 35 without specific invocation of "due process" principles. Nevertheless, the issues and their analysis are essentially the same here as under the liberty interest protected by due process, with the result depending largely upon where a particular jurisdiction places the balance between deference to the legislature and protection of individual liberties.
[2] For a discussion of similar invalidations of "fair trade" laws in other states, see Kirby, Expansive Judicial Review of Economic Regulation Under State Constitutions: The Case for Realism, 48 Tenn.L.Rev. 241, at 252-53 (1981).
[3] While there might be differences in analysis with respect to a purely criminal statute and one, such as we have before us, authorizing equitable relief and civil penalties, we note that most of the statutes quoted in the cases mix criminal, civil, and equitable provisions, and the cases do not bottom their analysis on the mens rea requirement for criminal punishment. Furthermore, the substantial civil penalty authorized by the statute before us would in all likelihood require a mens rea element if the analysis were to turn on that question.
[4] We think even the "affected with a public interest" test has some application under a means-end analysis. In terms of such an analysis, that test concentrates on the purpose to be achieved. Thus, if the object of the legislation is affected with a public interest, the legislative end is not only a permissible one, but an important one. The public need then weighs more heavily in the balancing of interests in the means analysis, leading to acceptance of a more severe intrusion into private interests.
[5] A fourth example has already presented itself. In Star Service & Petroleum Co. v. State ex rel. Galanos, 518 So.2d 126 (Ala.Civ.App.1986), the Court of Civil Appeals ruled that a retailer cannot pool the costs of the various grades of gasoline and thereby sell one grade below the individual cost of that grade. In this case the State says it would prove that Mapco sold regular gasoline for 92.9 cents per gallon at a time when the cost at the Mobile terminal of that grade plus applicable taxes was at least 96.9 cents per gallon.
[6] Cf. the Deceptive Trade Practices Act, § 8-19-1 et seq.
[7] We note that no question of federal law is presented as this appeal is postured. Cf. Dairymen, Inc. v. Alabama Dairy Comm'n, 584 F.2d 707 (5th Cir.1978).