**HOME OIL COMPANY, INC. Plaintiff,**

v.

**SAM'S EAST, INC. Defendant.**

**No. CIV.A.01–T–1251–S.**

United States District Court,
M.D. Alabama,
Southern Division.

April 26, 2002.

H. Dean Mooty, Jr., Mooty & Associates, PC, Montgomery, AL, for Home Oil Co., Inc.

Steven A. Benefield, Clark A. Cooper, Greer B. Mallette, A. Melissa Boles, Christian & Small, LLP, Birmingham, AL, Jon Comstock, Bentonville, AR, for Wal-Mart Stores, Inc., Sam's East Inc.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Home Oil Company, Inc., owns twelve retail gasoline/convenience stores in Houston County, Alabama, including one in Dothan located a quarter-mile from a Sam's Club owned and operated by defendant Sam's East, Inc. The plaintiff brings this lawsuit against the defendant based on alleged below-cost gasoline sales by defendant in violation of the Alabama Motor Fuel Marketing Act (AMFMA), 1975 Ala. Code §§ 8–22–1 to 8–22–18. Jurisdiction over the plaintiff's claims exists on the basis of diversity, 28 U.S.C.A. § 1332. This case is currently before the court on United States Magistrate Judge Delores R. Boyd's recommendation that the plaintiff's motion for a preliminary injunction be granted. The defendant has objected to the recommendation. For the reasons stated below, a preliminary injunction will issue.

Generally, a preliminary injunction should be granted if the movant clearly establishes that (1) there is a substantial likelihood of success on the merits, (2) irreparable injury will be suffered unless the injunction issues, (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) the injunction, if issued, would not be adverse to the public interest. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1307 (11th Cir.1998).

The plaintiff has argued, and the magistrate judge agreed, that, contrary to this general framework for issuing a preliminary injunction, injunctive relief under the AMFMA does not require an explicit showing of irreparable injury. Rather, because, among other things, the AMFMA provides that "Marketing of motor fuel is affected with the public interest," 1975 Ala. Code § 8–22–2, the nature of the statute is such that a violation itself presumes irreparable injury.[1] The court agrees with the analysis of the magistrate judge on this

---

1. On this issue, the magistrate judge found persuasive Judge Lynwood Smith's unpublished opinion in the case of *Campbell & Sons Oil Co. v. Murphy Oil USA, Inc.,* No. 99–03176–CV–S–NE (N. D.Ala. Jan. 3, 2000), aff'd, 237 F.3d 636, 2000 WL 1770518 (11th Cir.2000) (table), in which Judge Smith stated:

"When construing statutes designed to address social evils, conserve the environment, promote to free flow of interstate commerce, or impose restraints on domestic inflation during time of war, the tendency of federal courts has been to hold that an individual plaintiff is relieved of the burden of demonstrating irreparable harm as a pre-

issue. In fact, the court agrees with the magistrate judge's recommendation as to the final three requirements for preliminary injunctive relief: a level of injury, the balancing of harms, and public interest. Only the first requirement, likelihood of success on the merits, deserves some reconsideration.

## I. SUMMARY OF RELEVANT FACTS

Sam's Club is a wholesale club that requires its customers to purchase memberships in exchange for the privilege of shopping at the club and receiving the bargains offered by it. These memberships, renewed yearly, cost between $30 and $200. The club, as part of its business, sells gasoline both to members and nonmembers. Ninety percent of gasoline sales are made to club members at a 5 per-gallon discount; the remaining 10 % is sold to nonmembers at the higher price.

The plaintiff points to a period of weeks in October 2001 to demonstrate that Sam's Club has sold gasoline below cost at its Dothan store. For many of these days, the 5 per-gallon discount to members resulted in a price at the pump for gasoline that was substantially below the club's cost, as calculated by the plaintiff. In addition, on several days during this period, the price at which gasoline was sold to non-members was also below the club's cost.

The plaintiff reports a significant overall decrease, ranging from 4,000 to 11,000 gallons per month, in the volume of gasoline it sold to customers at its Dothan Home Oil gas station following Sam's Club's entry into the gasoline market. Only after the plaintiff lowered its prices to meet the club's member price did it experience any month where its gasoline sales were not lower than sales in the same month of the previous year. The plaintiff also presents evidence that its customers specifically asked why they should pay more for gas at Home Oil when they could go to Sam's Club.

## II. DISCUSSION

■ To determine whether there is a substantial likelihood of success on the merits, the court must analyze the legality of Sam's Club's conduct under the AMFMA. However, it must be remembered that, at the preliminary-injunction stage, the question is not whether the plaintiff will prevail in the litigation—rather, the question is whether it is substantially likely that the plaintiff will prevail. In addition, the court should point out that the findings of fact and conclusions of law made in deciding this motion for preliminary injunction are not binding at a trial on the merits; the discussion herein is in no way a disposition of the underlying claim. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981).

### A. Prima–Facie Case

■ The AMFMA provides:

"It shall be unlawful for any person engaged in commerce in this state to sell

---

condition for preliminary injunctive relief. Rather, in such situations the focus has been upon the public interest—especially when the statute under scrutiny contains an explicit finding of violations that will harm the public—and irreparable harm is presumed, subject always to the right of the defendant to rebut that presumption."
*Id.* at 20–21 (citing, among other cases, *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1424 (11th Cir.1984), and *Government*

*of Virgin Islands, Dept. of Conservation & Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283 (3d Cir.1983)). This court agrees with the magistrate judge and Judge Smith that the AMFMA is prototypically the type of statute that identifies certain practices as contrary to the public interest and, consequently, does not require a separate showing of irreparable injury to sustain a request for preliminary injunctive relief; irreparable injury is presumed in the violation itself.

or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition."

1975 Ala.Code § 8–22–6. In order to establish a prima-facie case of a violation of the AMFMA, the plaintiff must show (1) a sale of gasoline below cost, and (2) an injurious effect on competition. *State ex rel. Galanos v. Mapco Petroleum, Inc.,* 519 So.2d 1275, 1286 (Ala.1987).

### 1. Sale of Gasoline Below Cost

■ Generally, if the price at which motor fuel is sold to the consumer ($P_{mf}$) is less than the cost to the business of providing that motor fuel to the consumer (cost of motor fuel ($C_{mf}$) plus cost of doing business ($C_{db}$)[2]), then the sale is "below cost" within the meaning of the AMFMA:

$$\{P_{mf} < C_{mf} + C_{db}\} = \text{Violation of the AMFMA}$$
$$\{P_{mf} \geq C_{mf} + C_{db}\} = \text{No violation of the AMFMA.}$$

■ The defendant argues that the major failing of the magistrate judge's recommendation is that it did not properly consider the applicability of the "combined sale" statute of AMFMA, and, in particular, did not consider the required membership sold in conjunction with the sale of gasoline to members in making the determination as to whether a sale occurred below cost. The combined-sale statute, 1975 Ala.Code § 8–22–10, states:

"In all advertisements, offers for sale or sales involving two or more items, at least one of which items is motor fuel, at a combined price, and in all advertisements, offers of sale, or sales, involving the giving of any gift or concession of any kind whatsoever (whether it be coupons or otherwise), the wholesaler's or retailer's combined selling price shall not be below the cost to the wholesaler or the cost to the retailer, respectively, of the total of all articles, products, commodities, gifts, and concessions included in such transactions, except that if any such articles, products, commodities, gifts, or concessions, shall not be motor fuel, the basic cost thereof shall be determined in like manner as provided in subdivision (14) of Section 8–22–4."

Section 8–22–4(14), which is cited above, sets forth how the "basic cost of motor fuel" is to be calculated under the AMFMA.[3]

The defendant argues that, as membership is an requirement for anyone to receive the discounted member price for motor fuel, the price of the membership to

---

**2.** The cost to a retailer is defined as the invoice cost of the motor fuel less any trade discounts plus freight and taxes plus the cost of doing business. 1975 Ala.Code § 8–22–4(16); *see also id.* § 8–22–4(14). For simplicity's sake, the invoice cost less discounts plus freight and taxes is referred to in the formulas as the cost of motor fuel, as it represents the total amount paid for the motor fuel itself. The cost of doing business is kept distinct.

**3.** Section 8–22–4(14) provides:

"BASIC COST OF MOTOR FUEL. Whichever of the two following amounts is lower, namely, (i) the invoice cost of motor fuel to the wholesaler or retailer, as the case may be, or (ii) the lowest replacement cost of motor fuel to the wholesaler or retailer, as

the case may be, within five days prior to the date of sale, in the quantity last purchased (whether within or before the said five-day period), less, in either of said two cases, all trade discounts except customary discounts for cash, plus the full value of freight costs and any taxes which may be required by law, now in effect or hereafter enacted, if not already included in the invoice cost of the motor fuel to the wholesaler or retailer, as the case may be. In computing its basic cost of motor fuel, its cost of doing business and in meeting competition under Section 8–22–8; a refiner that assesses a processing fee of any kind for credit card transactions must assess such fees in a like manner to its affiliates."

1975 Ala.Code § 8–22–4(14).

the customer ($P_m$) and cost of the membership to the club ($C_m$) must also be taken into account. According to the defendant, the formula should look like this:

{Cmf + Cm + Cdb > Pmf + Pm} = Violation of AMFMA
{Cmf + Cm + Cdb ≤ Pmf + Pm} = No violation of AMFMA

The problem, of course, is in assigning values to $P_m$, the price of the membership to the customer, and $C_m$, the cost of the membership to the club. The defendant contends that the proper way to analyze its compliance with the AMFMA is to take an aggregate approach, to look at Sam's Club's overall business and the overall prices and costs of the memberships across its spectrum of customers. Using this approach, the defendant argues that the club's cost in providing the membership is zero. Its logic is as follows: The club sells the membership to a customer, entitling that customer to purchase club goods. The club would incur a cost for providing that right only if it lost money as a result of the customer's purchase of club goods. Therefore, if you look to the business in the aggregate, the cost of the membership to the club is basically the club's bottom-line; if the business makes a profit, then selling memberships does not have a cost. The defendant says that, because it makes a profit on the sale of all goods, the membership has no cost to the club, and the cost of membership ($C_m$) can be dropped from the equation:

{Pmf + Pm < Cmf + Cdb} = Violation of AMFMA
{Pmf + Pm ≥ Cmf + Cdb} = No violation of AMFMA

And because, according to the defendant, the price of the motor fuel sold to the members plus the price paid by all members for the membership exceeds the cost of all the motor fuel to the club plus its cost of doing business, it has not violated the AMFMA.[4]

The basic problem with the defendant's argument is that the combined-sale statute does not even apply to this sort of transaction. It is difficult to square the purchase of a membership by the consumer and a later purchase of goods with the "combined price" language in the combined-sale statute, 1975 Ala.Code § 8–22–10. One transaction entitles the consumer to make the second transaction. And while that entitlement, apparently, is the major argument for combining the two transactions for purposes of the statute, they are two still different and separate transactions. There is simply no combined price.

Moreover, it is clear form the AMFMA's codified "legislative findings" that the intent of the statute is not to bless this sort of transaction, where the below-cost sale of gasoline is insulated from illegality by wide-scale aggregate sale of other goods at or above cost. These legislative findings provide:

> "Unfair competition in the marketing of motor fuel occurs whenever costs associated with the marketing of motor fuel are recovered from other operations, allowing the refined motor fuel to be sold at subsidized prices .... Such subsidies most commonly occur ... where a business uses profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel."

1975 Ala.Code § 8–22–2.[5] Therefore, in line with the intent and language of the

---

4. The defendant writes: "Sam's member price for gasoline (including the amount charged at the pump for each purchase plus membership fees) at its Dothan Club has exceeded its cost of gasoline (including 'laid in' cost plus cost of doing business) as calculated under the AMFMA everyday since February 1, 2001."

5. Subsections (3) and (4) further underscore this policy against allowing a seller to insulate itself from the AMFMA by restricting the statute's application to an aggregate, wide-scale view of all sales and not just motor-fuel sales:

> "(3) Independent motor fuel marketers (*i.e.,* dealers, distributors, jobbers, and wholesalers) are unable to survive predatory subsidized pricing at the marketing level

AMFMA, the court concludes that the combined-sale statute does not apply to the instant situation, involving a membership and a later sale of discounted gasoline.[6]

To be sure, the combined-sale statute expressly allows some combination of fuel and non-fuel products as part of advertising. But the court refuses to expand this limited exception, for such things as "gift" and "coupons," to essentially swallow, as the defendant would have it, the whole rule or prohibition itself. For then, the exception would no longer be an exception but the rule itself, and one of the AMFMA's core prohibitions, against "us[ing] profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel," 1975 Ala.Code § 8–22–2, would be gutted.

Moreover, even if the AMFMA were to apply, the court is not convinced that, for the reasons just given, the combined cost should be determined by looking to the aggregate consumer price and business cost of all goods, both fuel and non-fuel, and the aggregate consumer price and business cost of club memberships, without some apportionment as to particular periods of time, transactions, or customers.

2. Evidence of Injury to Competition

■ The second part of the prima-facie case under the AMFMA is evidence that the below-cost sale injured competition. A showing by even one of the defendant's competitors of injury is sufficient to prove an AMFMA violation. *McGuire Oil Co. v. Mapco, Inc.*, 612 So.2d 417, 422 (Ala.1992).

Although the defendant argues that the plaintiff has not produced any significant evidence of injury to the competition, this is not a very strong argument. The plaintiff experienced a decline in the volume of gasoline sold after Sam's Club, and its allegedly below-cost pricing scheme, came onto the scene. In addition, Home Oil customers have questioned why they should pay higher prices for gasoline at Home Oil stations rather than going to Sam's Club. This evidence is sufficient to create a question as to the defendant's injury to competition.

The defendant contends that the decline of the plaintiff's business is due instead to the existence of five new gasoline stations in the immediate area rather than the club's competitive pricing practices. However, this is inherently a question of fact, and it is a matter best left for trial. As it stands, the plaintiff shows a substantial likelihood of success on the merits on the injury issue.

### B. Affirmative Defenses to AMFMA Liability

Having found a prima-facie case, the court must also consider the two affirmative defenses to liability raised by the defendant, that Sam's Club was meeting competition and that the club had no intent to injure competition.

### 1. Meeting Competition Defense

■ It is uncontested that Sam's Club sold gasoline to *nonmembers* at below cost on several days in October. The defendant contends that these sales were made

---

by persons when all of an independent's income comes from marketing operations. "(4) Subsidized pricing is inherently predatory and is reducing competition in the petroleum industry, and if it continues unabated, will ultimately threaten the consuming public."
1975 Ala.Code § 8–22–2(3) & (4).

**6.** It also cannot be overlooked that the focus of the statute is narrowed not only to gasoline

(as opposed to non-motor-fuel products) but also to each grade of gasoline separately. *Star Service & Petroleum Co. v. State*, 518 So.2d 126 (Ala.Civ.App.1986) (prices and costs must be computed separately for each grade of fuel in determining whether service station has violated the AMFMA by selling motor fuel below cost.)

at a price established to meet the competition's price in that area, as allowed by 1975 Ala.Code § 8–22–8(b).[7] Specifically, the defendant points to a Shell rebate program that gave a rebate on future gasoline purchases equal to 5% of purchases of Shell gasoline made on a Shell Mastercard, arguing that, effectively, Shell's program allows it to deeply discount its gasoline to the consumer. However, the defendant admits that *it did not know of the competition's lower price when it set its price on those days,* and admits furthermore that "if § 8–22–8(b) requires a retailer to know a competitor's lower price in order to be within the parameters of § 8–22–8(b), then Sam's sales to nonmembers on all the days ... on which Sam's sold below cost and below its known competitor prices would be outside the [meeting competition] defense."

The AMFMA's language requires that the below-cost price be "established in good faith to meet an equally low price of a competitor in the same market area." 1975 Ala.Code § 8–22–8(b). This language certainly contemplates that the business must actually know of a competitor's price before establishing a below-cost price in response to it. In addition, the Alabama Supreme Court has held that the meeting-competition defense is not available to vendors who price their gasoline one or two cents less than their competitors, *McGuire Oil Co. v. Mapco, Inc.,* 612 So.2d 417, 423 (Ala.1992), implying that knowledge of the specific price offered by competitors is necessary. Therefore, the meeting-competition defense is not available to the defendant for the club's below-cost sale of gasoline to non-members.

2. Lack of Intent to Injure Competition

■ Even if the prima-facie case under the AMFMA is established, the defendant may avoid liability if it raises and proves the affirmative defense of lack of intent to injure competition. The Alabama Supreme Court recognized this defense in *McGuire Oil,* 612 So.2d at 422, holding that were the lack of injurious intent not a defense to AMFMA liability, the liberty interests of the seller would be impermissibly curtailed.

■ The defendant states that the club never intended to violate the AMFMA. However, that is not the real question— the question, rather, is whether the club intended, by its pricing scheme, to injure the competition. A lack of injurious intent can be shown through a good-faith mistake in calculation or some other such harmless error, *see Galanos,* 519 So.2d at 1286–87, but an intentional pricing practice that results in significantly lower prices on gasoline cannot be said to evoke a lack of injurious intent. Sam's Club, a sophisticated market participant, would know that this practice would have the effect of drawing customers away from its competition.

■ In addition, under Alabama law, the lack of injurious intent is an *affirmative defense,* one in which the defendant bears the burden of proving. Based upon the showing currently made to this court, the success of the lack-of-injurious-intent defense is not so likely as to dispel the propriety of a preliminary injunction.

C. Probability of Success on the Merits

■ All of the foregoing analysis leads the court to find that the plaintiff does have a reasonable probability of success on

---

**7.** "It is not a violation of this chapter if any price is established in good faith to meet an equally low price of a competitor in the same market area on the same level of distribution selling the same or a similar product of like grade and quality ...." 1975 Ala.Code § 8–22–8(b).

the merits on its AMFMA claim. Therefore, the requirements for a preliminary injunction to issue have been met.

## III. CONCLUSION

For the foregoing reasons, it is the decision of this court that the magistrate judge's recommendation should be adopted in all relevant respects, and that a preliminary injunction should be entered in this case.

Accordingly, it is ORDERED as follows:

(1) That defendant Sam's East, Inc.'s objections, filed January 25, 2002 (Doc. no. 24), are overruled;

(2) That the recommendation of the United States Magistrate Judge, entered January 14, 2002 (Doc. no. 23), is adopted;

(3) That the motion for preliminary injunction filed by plaintiff Home Oil Company, Inc., on November 2, 2001 (Doc. no. 6), is granted; and

(4) That the parties are allowed until May 1, 2002, to submit to the court proposed wording for the preliminary injunction.

### *RECOMMENDATION OF THE MAGISTRATE JUDGE*

BOYD, United States Magistrate Judge.

Home Oil Company, Inc., an Alabama corporation which owns and operates a Chevron-branded gasoline station in Do-

than, seeks preliminary injunctive relief to prevent Sam's East, Inc., an Arkansas corporation [1] from selling gasoline at its Dothan retail facility below cost, in violation of the *Alabama Motor Fuel Marketing Act, Ala.Code* § 8–22–1, *et seq.* (1975). The Court conducted an evidentiary hearing on November 16, 2001.[2] After a careful consideration of the testimony and other evidence admitted at the hearing along with the pleadings, pre-hearing and post-hearing briefs and arguments of counsel, and the relevant law, it is the Recommendation of the Magistrate Judge that Plaintiff's Motion for Preliminary Injunction, filed November 2, 2001 (Doc. No. 6)[3], be GRANTED.

## I.

### FACTUAL BACKGROUND

The Plaintiff ("Home Oil") is a petroleum marketer with retail and wholesale divisions in southeast Alabama. Among its 12 retail gasoline/convenience food facilities in Houston County is a Chevron-branded station in Dothan, located at 2977 Montgomery Highway and operated under the trade name "Hobo Pantry Food Stores."[4] Designated by Home Oil as Hobo Pantry No. 17, this Chevron station has a convenience store, a car wash, and four multiproduct dispensers (MPD) for eight vehicles to secure gas at any given

---

1. Sam's East, Inc. is a wholly owned subsidiary of Wal–Mart Stores, Inc., d/b/a Sam's Wholesale Club, the originally designated defendant. With the Defendant's concurrence the Court granted Plaintiff's motion for substitution of defendants by Order filed November 19, 2001 (Doc. No. 16).

2. Separate court reporters recorded the morning and afternoon sessions of the hearing. For ease of reference, the 132–pp. transcript of the morning session is identified herein as *TR.No. 1*, and the 94–pp. transcript of the afternoon session is referred to as *TR. No.2*.

3. The verified complaint filed October 25, 2001 (Doc. No. 1) requested temporary, preliminary, and injunctive relief. By Order filed October 30, 2001, the District Judge denied the motion for a temporary restraining order, advised that such denial "should not be taken as an indication that the court would deny any motion for preliminary injunction...", and also "referred" any motion for preliminary injunction filed "to U.S. Magistrate Judge Delores R. Boyd for consideration and recommendation." (Doc. No. 3)

4. TR.No.1 at 19–20, 22.

time.[5] Operating approximately 600 yards away, inside the parking lot of Sam's Club, is the Defendant's (Sam's) retail gasoline facility at 3440 Ross Clark Circle, situated off Highway 231 south; with six MPDs, the station can accommodate 12 vehicles for simultaneous fueling. Unlike Sam's gasoline station, Home Oil's Chevron station is a 24–hour facility.[6]

Since it opened for business on December 6, 2000[7], the Sam's station averaged gasoline sales of "a little over 500,000 gallons a month," had sold "about 4,600,000 gallons of gas for its fiscal year beginning February 1, 2000, through October 31, 2000, and" a little bit greater than 90% of these sales were to Sam's Club members.[8] Owned by the Defendant, the Sam's wholesale club in Dothan has 86,073 members who pay an annual membership fee—ranging "from $30.00 to up to $200.00"—to join the club; a member has the privilege of purchasing items sold in the warehouse store or purchasing fuel from the parking lot pumps at a member price which is $.05 lower than the fuel price posted for non-members.[9]

Comparing the 12–months' period prior to the opening of Sam's gasoline station with the comparable months afterwards, Home Oil's President, Tim Shirley ("Shirley"), testified to a "significant decrease" in the monthly volume of his Chevron's sales for unleaded, no-lead plus, and super-unleaded gasoline, "with the exception of one month," in a range approximating "4,000 to 11,000 gallons per month."[10] Unlike Home Oil's Chevron station, Sam's

sells only two grades of gasoline—unleaded and premium.[11]

Seeking only injunctive relief, attorney's fees and costs, pursuant to § 8–22–17 and civil penalties authorized by § 8–22–16 of the Alabama Motor Fuel Marketing Act (AMFMA), Home Oil charges Sam's with violating the Act's prohibition on "below cost" fuel sales where the effect is to injure competition. The pertinent provision, § 8–22–6, declares:

> It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition.

## II.

## DISCUSSION

### A. ADEQUACY OF BASIS FOR EQUITY JURISDICTION

Preliminarily, Sam's challenges the propriety of the Court's exercise of equitable jurisdiction, pointing first to the alleged adequacy of legal remedies and next to its current compliance with the applicable statute. These contentions merit no extensive analysis but will be addressed seriatim.

---

5. TR. No. 1 at 24.

6. TR. No. 1 at 25–26.

7. TR. No. 2 at 49.

8. TR. No.2 at 46, 52.

9. Affidavit of Rich Ezell, Pl.Ex.9; TR.No.2 at 26–27.

10. TR. No.1 at 69–70; Pl.Exs.5,6.

11. TR.No.1 at 124. The octane levels for Sam's unleaded and unleaded premium are 87 and 93 respectively. For the unleaded, unleaded plus, and supreme gas sold at Home Oil's Chevron station, the respective octane levels are 87, 89, and 93. *Id.* at 125.

### 1. Adequate Legal Remedy

■ Notwithstanding Home Oil's express disavowal of any claim for the money damages authorized by the AMFMA,[12] Sam's suggests that preliminary injunctive relief is inappropriate because "no reference [in the AMFMA] is made to preliminary injunctive relief during the pendency of the action." Instead, Sam's contends, § 8–22–17(a) "provides for damages and injunctive relief only where violations or threatened violations of the AMFMA are "established."" (Def.'s Brief at 10). The contention is patently at odds with the express language of § 8–22–17(a), which provides in its entirety:

> Any person injured by any violation, or who would suffer injury from any threatened violation, of this chapter may maintain an action in any court of equity jurisdiction to prevent, restrain, or enjoin such violation or threatened violation. If in such action a violation or threatened violation of this chapter shall be established, the court shall enjoin and restrain, or otherwise prohibit, such violation or threatened violation and, in addition thereto, the court shall assess in favor of the plaintiff and against the defendant the costs of suit, including reasonable attorney's fees. In such action it shall not be necessary that actual damages to the plaintiff be alleged or proved, but where alleged and proved, the plaintiff in said action, in addition to such injunctive relief and cost of suit, including reasonable attorney's fees, shall be entitled to recover from the defendant the damages sustained by him.

(emphasis added).

As will be discussed, infra, in the context of the proof presented as support for the equitable relief requested by Home Oil, ample caselaw supports the intended authorization in § 8–22–17(a) for preliminary injunctive relief. See, e.g., Campbell & Sons Oil Company, Inc., et al. v. Murphy Oil USA, Inc., No. 99–03176–CV–S–NE (N.D.Ala. Jan. 3, 2000), aff'd, No. 00–10568, 2000 WL 1770518 (11th Cir. Nov. 1, 2000). Equally unavailing is Sam's rather cavalier view that such relief is unavailable because the statute entitles Home Oil to actual damages and Sam's is able to pay even the trebled award available for proven damages.[13] No authority is offered for the inference that this plaintiff should forfeit its choice of remedies in favor of the defendant's preferred remedy.

### 2. Post–Lawsuit Compliance

Sam's also disputes Home Oil's entitlement to injunctive relief by claiming, as follows, that since the filing of Home Oil's lawsuit on October 25, 2001, it has ceased

---

**12.** The verified complaint at ¶ 6 declares: "Plaintiff seeks no monetary damages as otherwise allowed under § 8–22–17(a)."

**13.** The contention is succinctly stated as follows:

> The Complaint states that Plaintiff does not intend to seek damages. No evidence, however, indicates that in the event Plaintiff prevailed on its claims it would not be able to collect such damages. Indeed, according to the Plaintiff's own Complaint, 'Defendant is the largest retailer in the world.' In addition, Plaintiff's alleged damages during the pendency of this litigation are calcula-

ble as evidenced by Plaintiff's own allegation that it has lost sales and margin to Sam's during the relevant time periods Plaintiff alleges Sam's violated the AMFMA. Accordingly, Plaintiff could pursue damages at law and could expect that Sam's would be able to comply with any future judgment rendered and that Plaintiff would be able to collect any damages it may be entitled to upon such judgment. Thus, Plaintiff has a completely adequate remedy at law which prevents this Court from properly invoking its equitable jurisdiction prior to a full trial of the case on the merits. (Def.'s Brief at 10–11).

any gasoline sales or pricing practices which are prohibited by the AMFMA:

> While Sam's does not believe that it has sold gasoline below its cost in the past, Sam's is presently in compliance with the AMFMA as evidenced by their gasoline pricing procedures and policies (citations omitted for evidentiary submissions) .... Therefore, Sam's prices will not violate the AMFMA as a matter of law. Sam's is not currently in violation of the AMFMA and will not be in violation of the AMFMA in the future under its clarified policy. There is no present or expected future violation to be enjoined. (Def.'s Brief at 5–6).

Whether Sam's has implemented, in fact, the changes claimed is an inquiry properly deferred for the Court's analysis of the injuries to be balanced in evaluating the merits of granting preliminary injunctive relief. Assuming *arguendo* the validity of Sam's claim, the pertinent inquiry for this threshold challenge is whether it follows that a preliminary injunction would be a "vain and useless effort".[14] The Court is not so persuaded and is duly mindful of its "duty", as the Supreme Court has admonished, "to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952); *accord, Secretary of Labor, U.S. Dept. of Labor v. Burger King Corp.*, 955 F.2d 681, 684 (11th Cir.1992).

Indeed, the strength of any assurances by Sam's of non-repetitive violations was significantly undermined by the testimony elicited through cross-examination of a Sam's officer whose testimony revealed the shortcomings of the affidavits underlying Sam's assurances. As evidence of its present compliance with the AMFMA, Sam's offered the Affidavit of Joe Hardin with two attached memoranda dated November 13, 2001, both captioned "Clarification of Gasoline Pricing Policy/Procedure, State of Alabama," one directed to Richard Ezell and another to "all general managers of Sam's Clubs in the State of Alabama."[15] In pertinent part, the memoranda declare Sam's intent that its "gasoline pricing policies and procedures...be in compliance with the AMFMA" and declare: "[i]n order to achieve continuous compliance with AMFMA, the price of Sam's premium and unleaded gasoline, including the five cent discount to Sam's Club Members, shall be set equal to, or greater than, the lowest price (including discounts, rebates, etc.) offered by or advertised by a competitor in the same market area for the same grade of fuel." A similar affidavit on November 12, 2001, from Richard Ezell ("Ezell"), who confirmed his responsibility as "the person who actually sets the retail price decisions for the Sam's in Dothan" (TR. No.2 at 61), provided, in pertinent part:

> Sam's Member prices met or exceeded the lowest competitor's price from November 2, 2001 through November 12, 2001. On the days before November 1, 2001 that prices may have fallen below the lowest competitor's price in October, Sam's either simply failed to react to a change in competitor's price because the person responsible was not at work and Sam's did not have the competitor's

---

**14.** Defendants cite *Foy v. Foy*, 447 So.2d 158, 163 (Ala.1984) ("It is axiomatic that equity will not use its powers to accomplish a useless purpose or to do a vain thing.") along with several federal cases which suggest a general reticence to enjoin past wrongs not shown to be continuing or immediately threatened (See Def.'s Brief at 7–8).

**15.** The Affidavit is Ex.C to Def.'s Brief and includes two memoranda admitted as Def. Ex.1 and Def. Ex. 2.

prices, or the price of the competitor did not change. In either event, the clarified Sam's policy eliminates the possibility of dropping below the competition.

Pl.Ex.9 at¶ 7

Ezell's cross-examination testimony disclosed several likely, albeit possibly unintended, opportunities for a breach of Sam's assurances for its continuing, voluntary compliance with the statutory prohibition on "below cost" gasoline sales.[16] Additionally, the testimony cast considerable doubt on whether the policy is enforced in Tuscaloosa, the only other location in Alabama for a Sam's-operated gasoline station. After acknowledging this second location and his responsibility for setting its gasoline prices as he did for the Dothan facility, Ezell could not confirm that Sam's post-lawsuit policy had been, or would be, distributed to govern the Tuscaloosa station as well.[17]

## B. ADEQUACY OF PROOF FOR PRELIMINARY INJUNCTION

### 1. Standards for Grant of Preliminary Injunctive Relief

The four prerequisites to be established by a movant for preliminary injunctive relief are well-established: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that, if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson* 147 F.3d 1301, 1307 (11th Cir.1998). Acknowledged as "an extraordinary and drastic remedy," a preliminary injunction "is . . . not to be granted unless the movant 'clearly established the burden of persuasion' as to the four prerequisites." *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983) (quoting *Canal Authority v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974).)[18]

---

**16.** The following colloquy between Plaintiff's counsel and Ezell is instructive:

Q: And it's your position . . . the clarified Sam's policy eliminates the possibility of dropping below the competition. Is that your position here today?
A: Yes, sir.

\* \* \* \* \* \*

Q: Well, to use your term, lots of things are possible, Mr. Ezell. What if the guy who makes the price decisions wasn't at work?
A: Then they will have clear direction on which wa o go.
Q: They weren't at work some days prior to November 1, as you say, as a basis for a problem.
A: Yes, sir.
Q: What if you don't get your surveys in from Dothan, what happens?
A: If we don't get a survey from Dothan we'll get ahold of the Club and ask them why we didn't receive it.
Q: What if the survey is wrong?
A: We have no way of knowing.
Q: Do you have any procedure that allows Sam's to verify the competitor prices that

are placed on those surveys that you say are E-mailed every day?
A: The member management do, yes, sir.
Q: What do they do?
A: They check them.
Q: They check them how?
A: Every day they drive around and check. As they're coming to work, if a member complains a price has changed, they will physically drive out to the location and check it.
Q: If he doesn't and just assumes there is not a price change and inputs the same price as the day before, do you have any way of knowing whether that occurs or not?
A: No, sir.
(TR. No.2 at 79–80).

**17.** See TR.No. 2 at 63–64.

**18.** See *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981, *en banc* ), adopting as binding precedent all of the decisions of the former Fifth Circuit promulgated prior to the close of business on 30 September 1981.

## 2. Evidentiary Analysis

### a. Likelihood of Success on Merits

Whether the movant for preliminary injunctive relief has "a substantial likelihood of success on the merits" requires a showing of only *likely,* rather than *certain,* success. The justification for not mandating a greater showing is best understood by reference to the underlying rationale for preliminary injunctive relief, as articulated by the Supreme Court in *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981):

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits. A party thus is not required to prove his case in full at a

preliminary injunction hearing, ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

Nonetheless, this first precondition is relatively important in that "[t]he requesting party's failure to demonstrate a 'substantial likelihood of success on the merits' may defeat the party's claim, regardless of its ability to establish any of the other elements." *Haitian Refugee Center, Inc. v. Christopher,* 43 F.3d 1431, 1432 (11th Cir.1995).

Home Oil's evidentiary showing for this prerequisite must be evaluated pursuant to the analytical framework for the statutory cause of action asserted. In *State ex rel. Galanos v. Mapco Petroleum, Inc.,* 519 So.2d 1275, 1286 (Ala.1987), the Alabama Supreme Court identified three sections of the AMFMA which, when necessarily construed together, buttress an actionable claim: § 8–22–3, *Legislative declaration and intent* [19]; § 8–22–6, *Certain below cost sales prohibited;* [20] and § 8–22–9, *Unlawful acts generally* [21].

---

[19]. It is hereby declared that marketing of motor fuel in Alabama is affected with the public interest. It is hereby declared to be the legislative intent to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state. It is further declared that the advertising, offering for sale, or sale of motor fuel below cost or at a cost lower than charged other persons on the same marketing level with the intent of injuring competitors or destroying or substantially lessening competition is an unfair and deceptive trade practice. The policy of the state is to promote the general welfare through the prohibition of such sales. The purpose of the Motor Fuel Marketing Act is to carry out that policy in the public interest, providing for exceptions under stated circumstances, providing for enforcement and providing penalties.

[20]. It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition.

[21]. It shall be unlawful under this section:
(1) For any person engaged in commerce in this state to sell or offer to sell motor fuel at wholesale or retail, as the case may be, where the effect is to injure competition.
(2) For any person, where the effect is to injure competition, to offer a rebate, to offer to give a rebate, to offer a concession of any kind in connection with the sale of motor fuel.
(3) For any retailer to induce or attempt to induce or to procure or attempt to procure the purchase of motor fuel at a price less than cost to wholesaler. Any person who violates any provision of this section shall be subject to the provisions and penalties of this chapter.

That Sam's and Home Oil are encompassed within the meaning of "persons", as referenced in these and other sections of the AMFMA, is evident from the following definition of "person" at § 8–22–4(1): "[a]ny person, firm, association, organization, partnership, business trust, joint stock company, company, corporation, or legal entity." The phrase "sale or sell", as prohibitively referenced in Sections 8–22–6 and 8–22–9, is clarified by this definition at § 8–22–4(7):

> *Any transfer for a combination, exchange, barter, gift, offer for sale, advertising for sale, soliciting an order for motor fuel and distribution in any manner or by any means whatsoever.*

That definition is further expanded, as follows, in one other pertinent provision, § 8–22–10:

> *In all advertisements, offers for sale or sales involving two or more items, at least one of which items is motor fuel, at a combined price, and in all advertisements, offers of sale, or sales, involving the giving of any gift or concession of any kind whatsoever (whether it be coupons or otherwise), the wholesaler's or retailer's combined selling price shall not be below the cost to the wholesaler or the cost to the retailer, respectively, of the total of all articles,products, commodities, gifts, and concessions included in such transactions, except that if any such articles, products, commodities, gifts, or concessions, shall not be motor fuel, the basic cost thereof shall be determined in like manner in provided in subdivision (14) of Section 8–22–4.*

Construing all these applicable provisions *in pari materia*, the Alabama Supreme Court declared that "the legislature has in explicit terms prohibited sales below

cost where the effect is to injure competition." *Galanos*, 519 So.2d at 1286. Accordingly, in order to establish a prima facie case, Home Oil must show (1) that Sam's made "below cost" gasoline sales and (2) that such sales had an injurious effect on competition. Sam's insists that Home Oil must also "prove that Sam's sales of gasoline, if below cost and below its competitor's prices, were made with the intent of injuring Plaintiff or other gasoline sellers in the Houston County marketing area..." (Def.'s Brief at 11). The *Galanos* Court, however, specifically negated such a heightened burden of proof, explaining:

> It may readily be seen that the legislature has in explicit terms prohibited only sales below cost where the effect is to injure competition... It is quite consonant with the spirit and terms of the Act to construe it as providing that the State *proves a prima facie case when it proves a sale below cost and an injurious effect on competition,* and yet as allowing the defendant to prove lack of a harmful intent either in avoidance of liability or in mitigation of any penalty, as the trier of fact shall determine. *Id.*[22] (emphasis added)

As now discussed, this Court concludes that Home Oil has made a sufficient evidentiary showing to establish both elements of the prima facie case, and it has shown thereby a substantial likelihood of success on the merits. The Court further finds and explains below that Sam's has not rebutted the prima facie case by its evidentiary showing to negate a harmful intent.

---

**22.** *See also* Chief Justice Torbert's concurring opinion, wherein he noted: "such an intent will be presumed upon a showing that the acts have the effect of injuring competition. The defendant can rebut that presumption by proving [as an affirmative defense] the lack of [a harmful intent."] *Id.* at 1289.

### (i) Sam's "Below Cost" gasoline sales

Home Oil uses October 9, 2001 through October 25, 2001 as a representative period to establish that Sam's sold gasoline below cost. Preliminarily, some perspective is in order for both the statutory parameters for Sam's cost and Sam's actual costs for gasoline during this period. The starting point is Alabama Code § 8–22–4(16), which provides:

COST TO RETAILER. As applied to retail sales, the invoice or replacement cost of the motor fuel within five days prior to the date of sale, in the quantity last purchased, whichever is less, less all trade discounts except customary discounts for cash, to which shall be added all applicable state, federal and local taxes, inspection fees, freight cost, if paid by the retailer, plus the cost of doing business.

Adding the "cost to retailer" with the "cost of doing business" [23] yields the cost which is commonly referred to in the industry as the "laid-in" cost, and that is the actual indicator of a retailer's cost for the gasoline which is resold to customers. As defined by Shirley, Home Oil's President, and not disputed by any of Sam's witnesses, "laid-in" cost refers to a retailer's "rack price plus taxes, plus freight to get the product to the location." The "rack price" is essentially the wholesale price which reflects an agreed-upon price between retailers such as Home Oil or Sam's and their suppliers at gasoline wholesaler terminals.[24]

Conceding its inability absent discovery to factor in Sam's *actual* cost for gasoline purchases, its *actual* cost of doing business, and other data necessary to calculate Sam's precise "laid-in" cost, Home Oil did establish, for the targeted period in October 2001, probative evidence of (a) the lowest posted rack prices for gasoline purchased at the Bainbridge, Ga. terminal, which is the nearest wholesaler to Dothan, (b) the laid-in cost, assuming taxes and freight charges from that terminal to Dothan, and (c) Sam's posted prices for gasoline purchased by its Club members at a discounted price of five cents below the price for non-members.[25] The evidence clearly shows that Sam's sold to its members gasoline at a price well below the laid-in cost. For example, Sam's posted member price for "87 octane unleaded gasoline" between October 9 and October 14 remained $0.949 while the laid-in costs for wholesale purchases at the Bainbridge terminal varied in these respective amounts: $1.01395; 1.00895; 1.00795; 1.02145; 1.02145. For the next ten consecutive days, Sam's offered its members a fixed price of $.0969 while the laid-in cost exceeded that retail price each day between October 15 and October 25.[26]

Based on this showing of sales to members at prices below laid-in costs, Home Oil argues that once Sam's actual cost of business is included, Sam's sales to members during the illustrative period fell substantially below its actual cost. Consider-

---

**23.** According to Section 8–22–4(17), COST OF DOING BUSINESS or OVERHEAD EXPENSES [i]ncludes all costs incurred in the conduct of business, including but not limited to: labor (including salaries of executives and officers), rent (which rent must be no less than fair market value based on current use), interest on borrowed capital, depreciation, selling cost, maintenance of equipment, transportation or freight cost, losses due to breakage or damage; credit card fees, or other

charges; credit losses, all types of licenses, taxes, insurance, and advertising.

**24.** TR.No.1 at 32–33; 47.

**25.** See Pl.Ex. 3 and Pl.Ex.4. Shirley secured Sam's prices by visual observations on a daily basis (TR.No.1 at 30–31), and the photographs admitted as Pl.Exs. 2A, 2B, and 2C illustrate a portion of the period.

**26.** See Pl.Ex.3.

ing Sam's own evidence of its actual costs during the comparable October 2001 period, as shown on Def.Ex.4, it is clear that Sam's sold to members below cost; for the same October 9–25 period hereinabove referenced, the evidence reflects the following for sales of unleaded gas:

| Date/October | Sam's Costs | Sam's member price * |
|---|---|---|
| 9 | 1.047 | 94.9 |
| 10 | 1.046 | 94.9 |
| 11 | 1.043 | 94.9 |
| 12 | 1.043 | 94.9 |
| 13 | 1.024 | 94.9 |
| 14 | 1.024 | 94.9 |
| 15 | 1.024 | 96.9 |
| 16 | 1.024 | 96.9 |
| 17 | 1.024 | 96.9 |
| 18 | 1.024 | 96.9 |
| 19 | 1.013 | 96.9 |
| 20 | 1.013 | 96.9 |
| 21 | 1.013 | 96.9 |
| 22 | 1.013 | 96.9 |
| 23 | 1.013 | 96.9 |
| 24 | 1.011 | 97.9 |
| 25 | 1.011 | 97.9 |

[* non-member price listed on Def.Ex. 4 less .05]

Questioned about the effect of modifying Def.Ex.4 to compare Sam's *member price,* rather than its *non-member price,* to its actual cost, Ezell could not deny the conclusion compelled by the foregoing analysis—that Sam's sold gasoline below costs to members.[27]

In contrast to Home Oil's exhibits, Sam's evidentiary exhibits focus on its non-member prices. The court agrees with Home Oil, however, that the member-discounted price should be the proper focus for comparison in evaluating whether Sam's is making prohibited sales. Section 8–22–9(2) makes it illegal to offer rebates or concessions of any kind where the effect is to injure competition. It is undisputed that 90% of Sam's gasoline sales are to Sam's Club members[28]. As will be documented, *infra,* Sam's gasoline sales to members had a substantial injurious effect on Sam's competitors.

### (ii) Injurious Effect on Competition

Although "injury to a competitor suffices to establish a violation of the AMFMA," *McGuire Oil Co. v. Mapco, Inc.,* 612 So.2d 417, 422 (Ala.1992), the following clarification from the Alabama Supreme Court is instructive:

> '[I]t is part of the normal competitive process for competitors to be 'injured' when they lose customers to a marketer who offers the public a lower price. Such 'injury' is not what the [A]MFMA addresses. Rather, it is injury to competition . . . due to certain unlawful sales tactics, such as selling motor fuel below cost. . . .'

(citations omitted). Guided by these principles, the Court now examines the evidence.

Home Oil's president testified—with supporting data contrasting sales for the comparable months prior to Sam's opening in December 2000–that Sam's below costs sales to club members caused a "significant decrease" in his gasoline sales. For each month from December 2000 through October 2001, sales "[went] down with the exception of one month . . . approximately 4,000 to 11,000 gallons per month." [29]

27.

Q: Do you know whether you've made a dime with your member price based on your cost as you have it on Defendant's Exhibit 4 since October 1?

A: Again, I wouldn't know that answer.

Q: Well you would agree that even on your form. Defendant's Exhibit 4, for those periods of time that are highlighted in the far-right hand column, even based on your numbers, you lost money on those days.

A: On the street price, yes, sir.

Q: And if you backed that off another five cents per gallon, you lose even more, right?

A: Again, you have to buy a member fee. You pay the membership fee to get that price

TR.No.2 at 73.

28. TR.No.2 at 52.

29. Pl.Exs. 5, 6; TR.No.1 at 69–70.

Home Oil's highest sale of 80,821 during this period—for July 2001—pales in comparison to Sam's average monthly sales of just under 500,000 gallons during each month since its opening. In July 2000, Home Oil experienced its highest sales—83,830 gallons—over the 24–months' period between October 1999 and October 2001. Only after Home Oil lowered its prices to meet Sam's member price did Home Oil experience any month (January 2001) when gasoline sales (70,864) were not lower than the same month in the previous year (63,483).[30]

As the following exchange illustrates, the substantial decline in Home Oil's gasoline sales was directly attributable to Sam's entry into the gasoline market:

> Q: To what do you attribute the volume loss we have identified earlier in your 13 month sales analysis?
>
> A: Sam's.
>
> Q: Why not another competitor?
>
> A: Gasoline marketing is complicated. But to answer, my customers have told me that. They ask me continuously why they should pay me [more] for gas than they do Sam's.
>
> TR.No.1 at 99–100.

### (iii) No injurious intent: Sam's "meeting competition" defense

Having found that Home Oil has sufficiently demonstrated both elements of the prima facie case for an AMFMA violation, the Court now evaluates Sam's affirmative defense that any below cost sales, as defined by the statute, were "established in good faith to meet an equally low price of a competitor," as authorized by § 8–22–8(b), which provides:

> It is not a violation of this chapter if any price is established in good faith to meet an equally low price of a competitor in

the same market area on the same level of distribution selling the same or a similar product of like grade and quality . . .

No credible evidence substantiates this defense.

Declaring that Sam's has "[never]intended to violate the AMFMA", Sam's operations manager for the fuel department, Ezell, testified at length regarding exhibits (Def.Exs. 3 and 4) prepared to compare the daily gasoline prices posted in October 2001 by the Sam's Club station and five of its nearest competitors: Home Oil's Chevron station, Shell, Cowboy's, Citgo, and Hopin. Their probative value, however, is significantly limited for analysis of its "meeting competition" defense because the prices indicated for Sam's reflect only the non-member price.[31] Omitting the Club member-discounted price of five cents less is especially inappropriate in light of five undisputed facts of critical importance to place in proper perspective Sam's and its gasoline competitors. *First*, "the overwhelming percentage—greater than ninety percent—of gasoline sales at [Sam's Dothan] facility are the holders of the Sam's Club . . . [who] get the five cent per gallon discount."[32] *Second*, Sam's post-lawsuit change in its pricing policy, implemented in order to avoid below cost sales prohibited by the AMFMA, directs, as follows, that Sam's *member* prices be compared with its competitors.

> In order to achieve continuous compliance with AMFMA, the price of Sam's premium and unleaded gasoline, *including the five cent discount to Sam's Club Members*, shall be set equal to, or greater than, the lowest price (including discounts, rebates, or any other type of price reduction) offered by or adverti-

---

**30.** TR.No.1 at 126.

**31.** TR.No.2 at 32.

**32.** TR.No.2 at 52.

sesd by a competitor in the same market area for the same grade of fuel. For purposes of this pricing procedure, you should conduct a competition market-survey of the following gasoline station competitors: . . .

(Def.Ex.1, emphasis added). The significance of the substitution of non-member prices in the defense exhibits prepared for the hearing can be appreciated in this exchange between Home Oil's counsel and Ezell:

Q: . . . and the non-member price that you have on . . . Defendant's Exhibits 3 and 4, is that a price at which you're doing less than ten percent of your volume at that store.

A: Yes.

Q. But your policy, as quote clarified in the November 13 memo to you, which is Defendant's Exhibit 1, is that you are to use the Sam's member price when determining one, where you are with respect to cost under the act; and, two, what your immediate competition is at. Is that correct?

A. Discounted competition, yes, sir.

TR.No. 2 at 61–62.

A *third* important factor warranting rejection of comparative analyses using only Sam's non-member price is that Sam's inexplicably began discounting its sales to members only in May 2001, approximately five months after opening its Dothan facility.[33] As a *fourth* consideration, from its start of business in December 2000 up to the month of the evidentiary hearing, Sam's facility—open half a day consistent with its warehouse club hours—averaged 400,000 to 500,000 gallons of monthly sales at this single facility with a "peak month" sale of over 624,000 gallons in July 2001.[34] By comparison, its plaintiff competitor, operating 24 hours daily, had gasoline sales from May 2001 through October 2001 which averaged barely 15% of Sam's. A *fifth* factor which merits concern is the validity of Sam's inclusion in its "cost of doing business" at its gasoline facility the "cost of operating a Sam's wholesale club facility as well."[35]

Both Home Oil's president and Shell's president cast credible doubt on Sam's claim that it lowered prices only to meet the competition.[36] Moreover, if Sam's *member* prices are substituted for the *non-member* prices during the comparative period, as properly they should be, then Sam's own exhibits of comparative prices belie its affirmative defense. That reality was graphically shown during Ezell's cross-examination, as illustrated by the following colloquy:

Q: . . . on Defendant's Exhibit 4 looking at October 5 where you have a Cowboy's price of a dollar, one point oh oh

---

33. TR.No.2 at 58.

34. TR.No.2 at 50.

35. See TR. No. 2 at 35–38, 71–72; Though a considerable portion of the hearing testimony focused on this question, the Court does not deem it a determinative matter—at this juncture—for evaluating either the prima facie case of liability or the proffered affirmative defense. Assuming the validity of Sam's stated cost of business on its evidentiary exhibits clearly inures to Sam's benefit, but if the cost is overstated, as Home Oil apparently contends, the result of the court's analysis in Home Oil's favor would not change.

36. TR.No. 1 at 86–109; Shell's President, Pate Weems, testified that he has never set prices at his station to match nearby Sam's "non-member" price (TR.No.2 at 9), but on one occasion in October 2001, Shell, along with Hopin and Cowboy's, did match Sam's member price of $0.999; explaining that Shell was not then attempting to compete with Sam's, Weems testified: "We didn't feel like we needed to be on a dollar as it is a whole different price point than ninety nine cents. If they had been ninety-eight, we would have gone to a ninety-nine." (*Id.* at 23).

[sic] nine cents, I guess that's a dollar and nine tenths of a cent a gallon, while your street price was a dollar two nine, your member price was ninety-seven nine.

A: Yes, sir.

Q: And a full three plus cents below anybody else based on your information. Correct?

A: Street price, yes, sir.

\* \* \* \* \* \*

Q: Have you ever lowered your price, your member price, to meet the price of a competitor that was lower than you?

A: I don't know that answer, but I would say no.

\* \* \* \* \* \*

Q: ...Isn't it true that the pricing practice of Sam's in October in Dothan, Alabama, was that if Cowboy's or Hopp Inn [sic] matched your house, whatever your member price was at the time that you would then react and go lower?

A: On some days, yes, we did.

Q: And if they matched you again, you would go lower again.

A: No, sir. There were several days that they did match us that we did not go lower.

Q: But they would have come down to match you?

A: Yes.

*TR. No.2 at 68–70.*

In a disingenuous effort to establish its "meeting competition" defense, Sam's offered exhibits which compared its non-member price, as well as its five-cent discount, member price, to Shell's "rebate" of five cents a gallon to its Shell MasterCard purchasers. Sam's contends that § 8–22–4(7) and § 8–22–10 of the AMFMA "equate advertising a price, including a discount or rebate, with the actual sale of gasoline at the discounted or rebated price." Because "the [Herndon Oil-operated] Shell gas station..advertise [s] a 5% rebate on Shell gasoline purchased with a Shell MasterCard...", Sam's argues:

> "...when Herndon Oil offers gas for sale and advertises the Shell 5% rebate, Herndon Oil is selling gas at the rebated price for purposes of the AMFMA, regardless of whether the owner of the station receives the full pump price or pays for the rebate in any way. Accordingly, Sam's is entitled to meet the price of gas sold by Shell after the advertised 5% rebate."

[Def.'s Supplemental Brief, filed November 19, 2001]

Two compelling facts make the argument simply beyond cavil. First, unlike the Sam's member who pays five cents less a gallon when the gasoline is purchased at Sam's pumps, the Shell MasterCard rebate program does not afford the cardholder an immediate reduction of five cents a gallon at the time the customer purchases and pays for gasoline pumped at the Shell station. As explained by Herndon Oil's president, Pate Weems:

> The Shell MasterCard gives a five percent rebate against future gasoline purchases, and gives a one percent rebate against purchases made at other locations. For example, if I used a Shell MasterCard at Sam's to buy something for a hundred dollars, I would accrue one dollar in free gas from Shell in the future.

\* \* \* \* \* \*

Q: What does the customer pay you, the holder of the Shell Master Card that comes to the Herndon Oil Shell location and buys gas with the Shell Master Card, does he pay you the full price?

A: Yes, the posted price.

Q: Without any discount?

Q: Who gives the rebate under the Shell Master Card?

A: I think it's an arrangement between Shell and Chase [Manhattan Bank]. I'm not sure what formulas they use to derive that.

\* \* \* \* \* \*

Q: Do you participate, again, you, Herndon Oil, the retailer of the gas, do you participate in that rebate in any way?

A: No. It doesn't cost us anything as a jobber and retailer in that location, nor do we get any of it in any form or fashion.

(TR.No.2 at 6–7)

The second fallacy in Sam's contention is the unfounded implication that Sam's actually responded to Shell's rebate program by setting prices solely to meet Shell's competition. Ezell, Sam's management executive empowered to set gasoline prices at the Dothan facility, admitted knowing absolutely nothing about Shell's rebate program prior to the filing of Home Oil's lawsuit on October 25, 2001.[37] Moreover, he prepared, solely in anticipation of the evidentiary hearing, the comparative exhibits (Def.Exs.3 and 4) which report Shell's gasoline price as the discounted rebate price; Shell's prices were neither known by him, nor considered at all as an influencing factor, when he set the gasoline prices for Sam's gasoline station in Dothan.[38] Thus, Sam's cannot argue with any credibility that its gasoline pricing in controversy should be sanctioned as statutorily authorized acts to meet Shell's competition.

### b. Irreparable Injury

Generally, a movant for preliminary injunctive relief must make a showing of irreparable harm absent such an equitable remedy. As the United States Supreme Court emphasized in *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (citations omitted), "irreparable" is the key word:

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

■ Citing the Alabama Legislature's findings in § 8–22–2, Home Oil asserts that it need not demonstrate that it will suffer irreparable harm as a precondition for the preliminary injunctive relief re-

---

37.
Q: When did you first learn there was such a thing as a Master Card rebate?
A: I couldn't answer that? I don't know.
Q: Since this lawsuit was filed?
A: I found out about it since this lawsuit, yes, sir.

\* \* \* \* \* \*

A: I didn't know that Shell had one. I knew others had one, yes, sir.

38. TR.No.2 at 54–68; see, e.g.,the following colloquy at 67–68:
Q: .....So ... all Defendant's Exhibit 3 and 4 are, are documents where you have cited after the fact taking the Shell street price and showing a discounted price by doing the math of the five percent rebate, correct?

A: The discount is, yes, sir.
Q: All right. That has nothing to do with pricing decisions you made from October 1. The Shell discount had absolutely nothing to do with pricing decisions Sam's made in Dothan, Alabama from October 1 until November 12 when the policy was clarified, correct?
A: Yes, sir.
Q: So to the extent you highlighted on Defendant's Exhibit 4 the Shell discounted price as a price that you contended was lower than the price that Sam's was posting, that has absolutely nothing to do with whether you were meeting tht price, because you weren't paying any attention to the discounted Shell price.
A: Yes sir...

quested for Sam's alleged breach of the AMFMA. It relies specifically on the findings at (1), (3), and (4) "that the marketing of motor fuel is affected with the public interest, that fuel distributors are unable to survive predatory subsidized pricing, that subsidized pricing is inherently predatory, is reducing competition, and if allowed to continue, will threaten the public." [39] Home Oil notes federal and state cases in support of its position but contends that "the issue should be decided as a matter of state law, not federal." For that proposition, it relies principally on the January 3, 2000 Memorandum opinion of Lynwood Smith, U.S. District Judge for the Northern District of Alabama, on granting a preliminary injunction in *Campbell & Sons Oil Company, et al. v. Murphy Oil USA, Inc.*, No. 99–03176–CV–S–NE (N.D.Ala. Jan. 3, 2000), *aff'd*, No. 00–10568, 2000 WL 1770518 (11th Cir. Nov. 1, 2000). Sam's discounts *Campbell* as a controlling opinion because Judge Smith purportedly "changed his mind" in his May 7, 2001 opinion which granted the permanent injunction opinion and reaffirmed the precondition of irreparable harm for preliminary injunctive relief.[40] After carefully scrutinizing both of Judge Smith's opinions, the Eleventh Circuit's per curiam affirmance of his grant of preliminary injunctive relief, and the relevant AMFMA provisions, this Court is persuaded by, and follows, the *Campbell* precedent.

The *Campbell* plaintiffs, all Alabama corporations selling motor fuel at wholesale and retail stations in Madison County, sued Murphy Oil USA, Inc., an Arkansas corporation, after it opened a retail gasoline outlet on the property of a Wal–Mart SuperCenter in Huntsville. As in this case, the *Campbell* plaintiffs charged *Murphy* with gasoline sales "below cost" in violation of the AMFMA, and argued that the legislative findings which triggered the AMFMA pretermitted any need to establish irreparable harm as a precondition to the injunctive relief requested under § 8–22–17(a).

After analyzing the pertinent case law, including several cases cited by Home Oil in this case, Judge Smith observed:

> The common thread lacing through all such judgments is this: When construing statutes designed to address social evils, conserve the environment, promote the free flow of interstate commerce, or impose restraints on domestic inflation during time of war, the tendency of federal courts has been to hold that an individual plaintiff is relieved of the burden of demonstrating irreparable harm as a precondition for preliminary injunctive relief. Rather, in such situations the focus has been upon the public interest—especially when the statute under scrutiny contains an explicit finding of violations that will harm the public—and irreparable harm is presumed, subject always to the right of the defendant to rebut that presumption.

(Mem. Op. at 20–21).

This court agrees both with Judge Smith's conclusion, explained as follows, that "the issue should be decided as a matter of state law, not federal," as well as his "application of state principles of statutory construction to the language of section 8–22–17(a)"....to "conclude that proof of irreparable harm is not required as a precondition for preliminary injunctive relief" in an action based upon Alabama Code § 8–22–17(a).[41]

Significantly, the non-published decision of the Eleventh Circuit appeal in *Campbell* recites:

---

39. PL. Brief at 15.

40. TR.No.1 at 10–13.

41. See Mem.Op. at 21–25.

Murphy argues that the preliminary injunction is due to be reversed because (i) a showing by Plaintiffs of irreparable harm is required in federal court; (ii) Plaintiffs cannot demonstrate irreparable harm because the only damage is lost profit; and (iii) the preliminary injunction is overbroad. (Op. at 3).

In finding no reversible error, the Circuit Court specifically addressed the contention advanced in this case by Sam's:

> Murphy Oil argues that the prerequisites for issuing a preliminary injunction were not met because Plaintiffs demonstrated no irreparable harm. The district court concluded that proof of irreparable harm was not required as a precondition for preliminary injunctive relief under the Alabama Fuel Act...

Contrary to Sam's insistence, Judge Smith did not abandon this view when he granted permanent injunctive relief to the *Campbell* plaintiffs; instead, the Court properly considered the question of "irreparable harm" in the context of the inadequacy of any legal remedy. (See May 1, 2001 Mem. Op. at 22–23).

### c. Balancing of Injuries

In balancing whether the threatened injury to a movant for preliminary injunctive relief outweighs the potential damage to the adverse party, the focus is on any harm that will occur between the grant of the injunction and a final trial on the merits. See *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983). Having touted its financial ability to withstand an award of substantial damages, it is difficult to imagine how Sam's would suffer

substantial harm if the court grants the requested preliminary injunction. Moreover, Sam's has produced considerable evidence in support of its defense that it has already modified its pricing policies to comply with the AMFMA and thus make unnecessary any injunctive relief. If that is the cause, the injunction will require Sam's to do no more than continue the newly instituted policies. Evidence from Home Oil, however, is compelling that its economic demise is guaranteed absent preliminary injunctive relief.

### d. Public Interest

The fourth prerequisite for a grant of preliminary injunctive relief is that the public interest not be adversely affected. The stated intent of the AMFMA is "to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state." § 8–22–3. In *State of Ala. ex rel. Galanos v. Star Service & Petroleum Co., Inc.*, 616 F.Supp. 429, 431 (S.D.Ala. 1985), the Court noted:

> "The state of Alabama has an interest in preventing unfair or dishonest competition, monopolies, and price wars... The Act protects those interests and thereby protects both independent retailers, ..., and the general consuming public."

Without purporting to decide whether Sam's is employing unfair competitive methods to subsidize its below cost gasoline sales, in a prohibited manner described in § 8–22–2(2), the Court notes that the hearing did elicit probative testimony from Sam's pricing officer for the Dothan facility.[42] Independent of the

---

42. For example, after conceding his inability to indicate whether Sam's had made any profit on its gasoline sales since establishing the

Dothan facility, Sam's responded as follows to pertinent questions by Home Oil's Counsel:

proof for subsidized pricing, however, the Court is persuaded by the overwhelming evidence of Sam's "below cost gasoline sales with the effect of injuring competition" that preliminary injunctive relief will serve the public interest.

## III.

## CONCLUSION

Based upon the foregoing analysis, it is the RECOMMENDATION OF THE MAGISTRATE JUDGE that the Plaintiff's motion for a preliminary injunction be granted and that the injunction be stated in the form set forth on the following page.

Jan. 14, 2002.

Q: Does it make any difference to Sam's whether it makes a dime on its gasoline business?
A: I don't think I'm at liberty to answer that... It makes a difference to me, yes, sir. We're not in the gasoline business to lose money, although gasoline is not our primary business.
Q: If you're losing money on your gasoline facility, who is making it up, who covers those losses?

A: We don't want to lose money.

\* \* \* \* \* \*

Q: If you lose money on your gas for a month, who makes up the difference?
A: That's part of our membership fees allocated to that.
TR.No. 2 at 73.